**Robert W. FABEC, Kathy M. Donnelly, Marco G. Terry, and Clayton T. Marquez, Petitioners–Appellants/Cross–Appellees (Initiative Proponents),**

v.

**Richard A. BECK and Catherine A. Dickerson, Respondents–Appellees/Cross–Appellants (Initiative Protestors),**

and

**Natalie Meyer, Secretary of State of Colorado, Respondent–Appellee/Cross–Appellant.**

No. 94SA408.

Supreme Court of Colorado, En Banc.

Aug. 19, 1996.

---

James E. Klodzinski, Trinidad, Craig Murdock, San Francisco, CA, for Petitioners–Appellants/Cross–Appellees.

Isaacson, Rosenbaum, Woods & Levy, P.C., Mark G. Grueskin, Juli E. Lapin, Denver, for Respondents–Appellees/Cross–Appellants.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Maurice G. Knaizer, Deputy Attorney General General, Legal Services Section, Denver, for Respondent–Appellee/Cross–Appellant.

Justice LOHR delivered the Opinion of the Court.

This case presents the issues of whether an initiative petition in support of a constitutional amendment authorizing limited gaming in Trinidad contains sufficient valid petition signatures to qualify for inclusion of the initiative on a statewide ballot, and whether the initiative proponents and initiative protestors complied with the statutory and administrative procedures that govern the petition and initiative process. After the Secretary of State (Secretary) issued an initial determination of insufficiency, the proponents submitted additional signatures in a supplemental petition, and the Secretary issued a formal letter of sufficiency. Both the proponents and the protestors sought judicial review of the Secretary's ruling. The district court reviewed the Secretary's signature count and determined that the Secretary erred as to 364 of the signatures by determining that they were valid. The district court held that without the invalidated signatures, the ballot initiative fell fifty-four signatures short of the constitutionally requisite number for inclusion on a statewide ballot. We affirm in part and reverse in part, reversing the district court's determination of invalidity as to ninety-two of the signatures. Accordingly, the initiative petition contains thirty-eight signatures more than the number of signatures necessary for inclusion on the statewide ballot, and we remand the case to the district court for further proceedings consistent with this opinion.

## I.

· On June 14, 1994, Robert W. Fabec, Kathy M. Donnelly, Marco G. Terry, and Clayton T. Marquez ("proponents") filed an initiative petition with the Secretary entitled "An amendment to the Colorado Constitution to permit limited gaming, subject to a future local vote, in original or reconstructed historic buildings in the National Historic District of the City

of Trinidad and to allocate tax and fee revenues from such limited gaming." The petition contained 87,294 total signatures. Under standards prescribed by the Colorado Constitution, a petition required 49,279 valid signatures to be eligible for placement on the November 1994 ballot. The Secretary conducted a random sample and after determining by extrapolation that the petition contained approximately 44,080 valid signatures, or 89% of the required amount, issued a statement of insufficiency on June 30, 1994.[1]

The proponents sought to cure the deficiency by filing a supplemental petition on July 15, 1994. The Secretary then conducted a line-by-line review of each signature in both the original petition and the supplemental petition, and determined that the original petition actually contained 42,797 valid signatures and the supplemental petition contained 6,792 valid signatures. The Secretary concluded that the other 51,452 submitted petition signatures were invalid. Combining both the original and supplemental petitions, the Secretary determined that the proponents submitted a total of 49,589 valid signatures, or 310 more than the required amount. The Secretary therefore issued a statement of sufficiency on July 25, 1994. On August 23, 1994, Fabec filed a protest and complaint in Denver District Court challenging the Secretary's invalidation of certain signatures despite the Secretary's statement of sufficiency, and Richard A. Beck and Catherine A. Dickerson ("protestors") filed their own protest and complaint in that court a day later, contesting the Secretary's validation of certain other signatures. On motion, the district court consolidated the two cases.

After reviewing the Secretary's determinations, the district court invalidated 364 of the signatures the Secretary had validated. As a result, the petition fell fifty-four signatures short of the minimum necessary for placement on the 1994 ballot. Because the 1994 ballots had already been printed, the court enjoined the Secretary from counting any of the votes cast with regard to the initiative. The proponents filed an appeal and petition for review of the district court's ruling,[2] and the protestors filed a cross-appeal. We review the district court's determinations on direct appeal pursuant to the jurisdictional authority set forth in section 1–40–119, 1B C.R.S. (1995 Supp.), and now affirm in part and reverse in part.

## II.

We briefly review the procedure for initiating constitutional amendments, as established by the Colorado Constitution and statutes at the times relevant here, to set the stage for our discussion of the issues in this case.[3] "Article V, section 1(2) of the Colorado Constitution reserves to the registered electors of the State of Colorado the constitutional right to initiate legislation and constitutional amendments." *Matter of Election Reform Amendment*, 852 P.2d 28, 31 (Colo. 1993); *see also* Colo. Const. art. V, § 1(2). In order to qualify for the ballot, initiative proponents must circulate initiative petitions and collect "signatures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election." Colo. Const. art. V, § 1(2).

Prior to obtaining any signatures, the proponents must submit a draft of the proposed initiative "to the legislative research and drafting offices of the general assembly for

---

1. Section 1–40–116(4) requires the Secretary to "verify the signatures on the [initiative] petition by use of random sampling." § 1–40–116(4), 1B C.R.S. (1994 Supp.). Subsequently, "[i]f the random sample verification establishes that the number of valid signatures is ninety percent or less of the number of registered eligible electors needed to find the petition sufficient, the petition shall be deemed to be not sufficient." *Id.*

2. The record reflects that the proponents sought to obtain on appeal a reversal of the Secretary's invalidation of certain signatures in anticipation

that the protestors might successfully challenge the validation of others and thereby reduce the number of valid signatures below the constitutionally required number.

3. For the sake of convenience, we refer in this opinion to statutory provisions updated through the 1994 Supplement to the Colorado Revised Statutes. Unless otherwise noted, current and parallel statutory provisions are either identical or were amended without relevant changes after 1994.

review and comment." Colo. Const. art. V, § 1(5); *accord* § 1–40–105, 1B C.R.S. (1994 Supp.). After any subsequent amendments and again prior to obtaining any signatures, the proponents must submit the "full text" of the proposed initiative by petition, "addressed to and filed with the secretary of state at least three months before the general election at which [the initiative is] to be voted upon." Colo. Const. art. V, § 1(2); *accord* § 1–40–105(4), 1B C.R.S. (1994 Supp.). The Secretary then convenes a title board, which must prepare for the initiative a "proper fair title," a "submission clause," and a "clear, concise summary," which shall include an estimate and explanation of the prospective "fiscal impact" of the initiative. § 1–40–106, 1B C.R.S. (1994 Supp.).

Proponents then arrange to circulate copies of the initiative petition and accumulate the constitutionally requisite number of signatures from "registered electors." Colo. Const. art. V, § 1(2); § 1–40–111(1), 1B C.R.S. (1994 Supp.). The Secretary prescribes the form of the petition for statewide ballot issues. §§ 1–40–102, –113, 1B C.R.S. (1994 Supp.). "Each registered elector shall sign his or her own signature and shall print his or her name, the address at which he or she resides, including the street number and name, the city and town, the county, and the date of signing." § 1–40–111(1), 1B C.R.S. (1994 Supp.); *see also* Colo. Const. art. V, § 1(6). The proponents must submit the circulated petitions to the Secretary accompanied by attached affidavits from the circulators attesting to the veracity of the signatures and the status of the signers as registered electors. Colo. Const. art. V, §§ 1(2), 1(6); *see also* §§ 1–40–111(2), –116(1), 1B C.R.S. (1994 Supp.). Section 1–40–111(2), 1B C.R.S. (1994 Supp.), mandates detailed verification of the collected signatures to maintain integrity in the initiative process and to comply with the constitutional requirements. *See* Colo. Const. art. V, § 1(6). A properly verified petition meeting constitutional requirements "shall be prima facie evidence that the signatures thereon are genuine and true and

that the persons signing the same are registered electors." Colo. Const. art V, § 1(6); *see also* § 1–40–116(1), 1B C.R.S. (1994 Supp.) (circulator affidavit is "prima facie evidence that the signatures are genuine and true, that the petitions were circulated in accordance with the provisions of this article [40], and that the form of the petition is in accordance with this article"). The Secretary then determines whether the proponents gathered the constitutionally requisite number of valid signatures for inclusion on the statewide ballot, § 1–40–116, 1B C.R.S. (1994 Supp.), and issues a statement of sufficiency or insufficiency, § 1–40–117, 1B C.R.S. (1994 Supp.).[4] If the Secretary issues a statement of insufficiency, the proponents "may cure the insufficiency by filing an addendum to the original petition for the purpose of offering such number of additional signatures as will cure the insufficiency." § 1–40–117(3)(b), 1B C.R.S. (1994 Supp.).

If the proponents gather the constitutionally requisite number of signatures, the Secretary must submit the proposed measure to the people "for adoption or rejection at the polls." Colo. Const. art. V, § 1(7). Prior to the election, however, the "nonpartisan research staff of the general assembly" must publish the text, title, and a "fair and impartial analysis" of each measure and must make that information available to the public. Colo. Const. art. V, §§ 1(7.3), 1(7.5); *see also* §§ 1–40–124, –124.5, 1B C.R.S. (1994 Supp.).

### III.

■ The proponents initially contend that the protestors failed to exhaust their administrative remedies and that the protest and complaint filed by the protestors in district court therefore is barred under traditional principles of administrative law. We disagree. Properly construed, the statutes at issue here provide for district court review of the Secretary's sufficiency determination. We conclude that the protestors followed the appropriate review procedure in this case.

---

4. For brevity, we sometimes refer to the Secretary's statement of sufficiency or insufficiency as a "sufficiency statement."

If a plaintiff fails to exhaust administrative remedies before seeking judicial review of an administrative decision, the court may lack jurisdiction to grant the requested relief. *Horrell v. Department of Admin.*, 861 P.2d 1194, 1197 (Colo.1993); *Gramiger v. Crowley*, 660 P.2d 1279, 1281 (Colo.1983). "Where administrative remedies are provided by statute, the statutory procedure must be followed when the matter complained of is within the jurisdiction of the administrative authority." *Denver–Laramie–Walden Truck Line, Inc. v. Denver–Fort Collins Freight Serv., Inc.*, 156 Colo. 366, 370, 399 P.2d 242, 243 (1965); *accord Brooke v. Restaurant Servs., Inc.*, 906 P.2d 66, 71 (Colo.1995); *Horrell*, 861 P.2d at 1197. Plaintiffs must exhaust available and applicable administrative remedies in order to prevent piecemeal application for judicial relief, to avoid unwarranted interference by the judiciary in the administrative process, and to conserve judicial resources. *Horrell*, 861 P.2d at 1197; *see Brooke*, 906 P.2d at 71.

The legislature provided two review procedures, one to assure the sufficiency of signatures to support an initiated measure, and the other to address violations of the petition circulation requirements. The first, found in sections 1–40–118 and 1–40–119, 1B C.R.S. (1994 Supp.), is the procedure that the protestors followed in this case. Sections 1–40–118(1) and 1–40–119 specifically provide for review of the Secretary's determination that a petition contains or lacks a sufficient number of valid signatures to qualify for a place on the ballot. *See* §§ 1–40–118(1), –119, 1B C.R.S. (1994 Supp.). Section 1–40–118(1) requires the Secretary to issue "a statement as to whether the petition has a sufficient number of valid signatures" no later than thirty calendar days after the proponents file the petition. § 1–40–118(1), 1B C.R.S. (1994 Supp.). A registered elector

seeking to protest the Secretary's statement must file a protest in the district court for the county in which the proponents filed the petition within thirty days of the issuance of the Secretary's statement. *Id.*[5] A protest must include the grounds for the protest in accordance with specific statutory requirements. § 1–40–118(2), 1B C.R.S. (1994 Supp.). To assist a protestor in determining whether signatures are those of registered electors, the Secretary "shall furnish a requesting protestor with a computer tape or microfiche listing of the names of all registered electors in the state." § 1–40–118(4), 1B C.R.S. (1994 Supp.). A district court must commence a protest hearing as soon as conveniently possible and shall conclude the proceedings within thirty days after commencement. § 1–40–119, 1B C.R.S. (1994 Supp.). The district court must "forthwith certif[y]" the results of the hearing "to the designated representatives of the signers and to the protestors of the petition." *Id.* Upon application, the Colorado Supreme Court shall review the decision of the district court. *Id.* The foregoing procedure does not require an administrative review of the Secretary's determination concerning the sufficiency of petition signatures before a protestor can seek judicial relief. *See* §§ 1–40–118, –119, 1B C.R.S. (1994 Supp.). The protestors properly followed the procedure for district court review outlined in sections 1–40–118 and 1–40–119.

The proponents assert, however, that the protestors were required to follow the procedure outlined in section 1–40–132(1), 1B C.R.S. (1994 Supp.), to challenge the Secretary's statement of sufficiency. Section 1–40–132(1) provides for an administrative hearing before the Secretary on "any alleged violation of the provisions relating to the circulation of a petition." *Id.* Because the protesters did not seek such a hearing, the

5. Section 1–40–118(1), at the time relevant to this case, provided:

A protest in writing, under oath, together with three copies thereof, may be filed in the district court for the county in which the petition has been filed by some registered elector, within thirty days after the designated election official issues a statement as to whether the petition has a sufficient number of valid signatures, which statement shall be issued no later

than thirty calendar days after the petition has been filed.

§ 1–40–118(1), 1B C.R.S. (1994 Supp.). Section 1–40–118(1) was amended without relevant changes in 1995, except for the substitution of "secretary of state" for "designated election official." *See* § 1–40–118(1), 1B C.R.S. (1995 Supp.); Ch. 120, sec. 13, § 1–40–118(1), 1995 Colo. Sess. Laws 422, 435.

proponents contend, the protestors failed to exhaust their administrative remedies and the district court therefore lacked jurisdiction to consider the protestors' challenge to the Secretary's statement of sufficiency. We do not agree that the procedures set forth in section 1–40–132(1) apply to determinations regarding whether a petition has a sufficient number of valid signatures to qualify for placement of an initiated measure on the ballot.

Section 1–40–132(1) provides in relevant part:

> The secretary of state is charged with the administration and enforcement of the provisions of this article relating to statewide initiated or referred measures and state constitutional amendments.... The secretary of state may conduct a hearing, upon a written complaint by a registered elector, on any alleged violation of the provisions relating to the circulation of a petition, which may include but shall not be limited to the preparation or signing of an affidavit by a circulator. If the secretary of state, after the hearing, has reasonable cause to believe that there has been a violation of the provisions of this article relating to statewide initiated or referred measures and state constitutional amendments, he or she shall notify the attorney general, who may institute a criminal prosecution. If a circulator is found to have violated any provision of this article or is otherwise shown to have made false or misleading statements relating to his or her section of the petition, such section of the petition shall be deemed void.

§ 1–40–132(1), 1B C.R.S. (1994 Supp.).

Section 1–40–132(1) is inapplicable to this case. Read in context, section 1–40–132(1) addresses violations that involve criminal culpability. Upon a finding by the Secretary that there is "reasonable cause to believe that there has been a violation of the provisions of this article relating to statewide initiated or referred measures and state constitutional amendments," the Secretary "shall notify the attorney general, who may institute a criminal prosecution." *Id.* Although a finding that a circulator "violated any provision of this article or is otherwise shown to

have made false or misleading statements relating to his or her section of the petition," results in that section being "deemed void," section 1–40–132(1) does not provide any procedure for assessing the validity of signatures absent misconduct by a circulator or a person signing a petition. *See id.* Thus, sections 1–40–118 and 1–40–132(1) provide parallel procedures serving different purposes. The administrative hearing required by section 1–40–132 is inapplicable to general proceedings regarding a Secretary's sufficiency determination.

Furthermore, the heading of section 1–40–132(1), "Enforcement," and the placement of section 1–40–132(1) in the statutory provisions following section 1–40–130, 1B C.R.S. (1994 Supp.) (specifying a number of "[u]nlawful acts" relating to circulating and signing petitions and prescribing penalties therefor), and section 1–40–131, 1B C.R.S. (1994 Supp.) (proscribing "[t]ampering" with an initiative or referendum petition and specifying penalties for such violations), provide additional support for our construction of section 1–40–132(1). *See, e.g., Smith v. United States,* 508 U.S. 223, 233, 113 S.Ct. 2050, 2056, 124 L.Ed.2d 138 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute."); *Thompson v. Thompson,* 484 U.S. 174, 183, 108 S.Ct. 513, 518, 98 L.Ed.2d 512 (1988) ("language and placement" of a statute inform statutory interpretation); *Association of Nat'l Advertisers, Inc. v. Lungren,* 44 F.3d 726, 729 (9th Cir.1994) ("placement" of statute within other statutory provisions provides an indication of subject matter and legislative intent); *Lathe v. State, Department of Revenue, Motor Vehicle Div.,* 691 P.2d 356, 357 (Colo.App. 1984) (a "statute's placement in the overall statutory scheme" aids in statutory interpretation); *see also, e.g., A.B. Hirschfeld Press, Inc. v. City and County of Denver,* 806 P.2d 917, 920 (Colo.1991) ("In interpreting a comprehensive legislative scheme, we must give meaning to all portions thereof and construe the statutory provisions to further the legislative intent."). The placement of section 1–40–132(1) following two sections concerning criminal misconduct reinforces our reading

that section 1–40–132(1) also addresses criminally culpable misconduct.

Finally, legislative history supports our determination that section 1–40–118, 1B C.R.S. (1994 Supp.), provides the proper avenue for a direct review of the Secretary's sufficiency determination. Under the statutory predecessor to section 1–40–118, protestors were required to file a protest to the Secretary's sufficiency statement in the office where the proponents filed the petition. Ch. 183, sec. 1, § 1–40–118, 1993 Colo. Sess. Laws 676, 688. Prior to 1993, an administrative official was to conduct a hearing on such a protest, with judicial review available thereafter pursuant to section 24–4–106, 10A C.R.S. (1988), of the Administrative Procedure Act. *See* Ch. 183, sec. 1, § 1–40–118, –119, 1993 Colo. Sess. Laws 676, 688–89. In 1993 the General Assembly extensively amended and renumbered these sections to provide for direct review in district court of a Secretary's sufficiency statement. *Id.* The legislative history reflects a legislative decision to eliminate the need for an administrative hearing and to allow direct review by a district court to assess the correctness of a Secretary's sufficiency statement and to determine whether the measure is eligible for inclusion on the ballot.

Based on the foregoing analysis, we hold that the protestors properly sought district court review of the Secretary's sufficiency determination, pursuant to sections 1–40–118 and 1–40–119, without first pursuing the administrative remedies outlined in section 1–40–132(1).

### IV.

■ The proponents' second contention is that the Secretary employed an improper procedure in determining the total number of valid petition signatures after the proponents submitted additional signatures by addendum in response to the Secretary's determination that the original petition lacked the requisite number of valid signatures. Relying on Rule 17.3, 8 C.C.R. 1505–1 (1993), the Secretary reviewed each signature in the original petition and in the addendum to arrive at the total number of valid signatures. The proponents urge that Rule 17.3 is both in derogation of the Secretary's rulemaking authority and in conflict with section 1–40–116(4), 1B C.R.S. (1994 Supp.). They contend that the proper counting method is to add the number of valid signatures on the original petition, determined by random sampling under section 1–40–116(4), to the number of valid signatures stemming from a line-by-line examination of the signatures on the addendum. The method prescribed by Rule 17.3 yielded a total of 49,589 valid signatures, as determined by the Secretary, whereas the method contended for by the proponents resulted in a count of 50,872 valid signatures. Thus, the proponents contend, the Secretary should have added 1,283 signatures to the number of valid signatures. We conclude that the legislature authorized the Secretary to adopt Rule 17.3 and that Rule 17.3 is consistent with section 1–40–116(4). We therefore reject the proponents' argument.

Section 1–40–116(4) prescribes a random sampling procedure for verifying the signatures on an original petition. The random sampling "shall include an examination of no less than five percent of the signatures, but in no event less than four thousand signatures." § 1–40–116(4), 1B C.R.S. (1994 Supp.). The statute prescribes the consequences that follow after a determination of the number of verified signatures based on the random sampling results:

If the random sample verification establishes that the number of valid signatures is ninety percent or less of the number of registered eligible electors needed to find the petition sufficient, the petition shall be deemed to be not sufficient. If the random sample verification establishes that the number of valid signatures totals one hundred ten percent or more of the number of required signatures of registered eligible electors, the petition shall be deemed sufficient. If the random sampling shows the number of valid signatures to be more than ninety percent but less than one hundred ten percent of the number of signatures of registered eligible electors needed to declare the petition sufficient, the secretary of state shall order the examination and verification of each signature filed.

*Id.* In the present case, the random sampling process resulted in a conclusion that the petition contained 44,080 valid signatures, or 89% of the 49,279 signatures required. Pursuant to section 1–40–116(4), the Secretary determined that the petition was insufficient and issued a statement of insufficiency without conducting a line-by-line examination of each signature entry.

The proponents had the opportunity to file a timely addendum to the petition containing enough additional valid signatures to remedy the deficiency. § 1–40–117(3)(b), 1B C.R.S. (1994 Supp.). They did so. Pursuant to section 1–40–117(3)(b), the Secretary then "order[ed] the examination and verification of each signature on the addendum." *Id.* The Secretary determined that the addendum contained 6,792 valid signatures. Instead of combining the 6,792 new valid signatures with the 44,080 validated under the random sampling method, for a total of 50,872, the Secretary examined each signature on the original petition and determined that the petition actually contained 42,797 valid signatures instead of the 44,080 determined by the random sampling method. The Secretary then combined the number of valid signatures determined by a line-by-line examination of both the original petition and the addendum for a total of 49,589 signatures, or 310 more than the required minimum. On appeal, the district court held 364 of the signatures invalid, and concluded that the petition fell short of the required signature number by fifty-four signatures. The proponents urge that the Secretary should have combined the line-by-line count of valid addendum signatures with the 44,080 determined by random sampling of signatures on the original application for a total of 50,872, or 1,593 more than the required minimum, a sum well in excess of the required minimum even after deducting the signatures found invalid by the district court. We disagree with the proponents' argument.

■ In employing the counting procedure at issue here, the Secretary relied on Rule 17.3. The Secretary promulgated Rule 17.3, which provides:

If the number of valid signatures in the addendum when added to the number of valid signatures given in the statement of insufficiency equals more than 90% but less than 110% of the required signatures and the initial check was by random sample, all of the previously submitted entries shall be checked. The total of valid signatures in the original petition shall then be added to the number of valid signatures submitted in the addendum.

Rule 17.3, 8 C.C.R. 1505–1 (1993). Addition of the 6,792 valid signatures in the addendum to the 44,080 in the original petition, as determined by random sampling and set forth in the statement of insufficiency, resulted in a total of 50,872 valid signatures, or 103.2 percent of the 49,279 signatures required. Because this figure was more than 90 percent but less than 110 percent of the required signatures, the Secretary examined, line-by-line, all of the entries on the original petition as well as the addendum pursuant to Rule 17.3 and arrived at a total of 49,589 valid signatures, or 310 more than the number required.

The proponents assert that the procedure followed by the Secretary is contrary to section 1–40–116(4) and exceeds the Secretary's statutory authority. However, Rule 17.3 and section 1–40–116(4) are harmonious. Section 1–40–116(4) prescribes the random sampling method to determine the number of valid signatures in an original petition, and obviates the need for an examination of each signature when the number of valid signatures determined by random sampling is ninety percent or less of the required number. § 1–40–116(4), 1B C.R.S. (1994 Supp.). The purpose of section 1–40–116(4) is to enable the Secretary to issue a statement of insufficiency regarding the original petition without a line-by-line examination of each signature when the results of the random sampling method indicate that the signature deficiency is of sufficient magnitude that a precise count would not produce a contrary result. The premise underlying section 1–40–116(4) is that the margin of error produced by the random sampling method does not exceed plus or minus ten percent. Applying this premise, the random sampling method tests the proponents' compliance with our constitutional requirement that "sig-

natures by registered electors in an amount equal to at least five percent of the total number of votes cast for all candidates for the office of secretary of state at the previous general election shall be required to propose any measure by petition." Colo. Const. Art. V § 1(2); *see also* § 1–40–109(1), 1B C.R.S. (1994 Supp.) (mandating compliance with signature requirements in constitution). Section 1–40–116(4), however, says nothing about the counting method the Secretary should utilize when proponents file an addendum to remedy an insufficiency. We therefore reject the proponents' contention that Rule 17.3 conflicts with section 1–40–116(4).

Furthermore, the procedure prescribed by Rule 17.3, for circumstances involving an original petition and an addendum, mirrors the procedure for an original petition prescribed by the legislature in section 1–40–116(4). Both Rule 17.3 and section 1–40–116(4) require that when the Secretary initially determines that the number of valid signatures ranges from more than 90 percent to less than 110 percent of the required number, either entirely by random sampling (in the case of an original petition) or in part by random sampling (in the case of an original petition and an addendum), the Secretary must examine all of the signatures, utilizing a line-by-line method, to assure that a petition with sufficient signatures will not be denied a place on the ballot and that a petition lacking sufficient signatures will not appear on the ballot. Rule 17.3, therefore, assures compliance with our constitutional initiative requirements.

■ Rule 17.3 also does not exceed the Secretary's statutory rulemaking authority. The legislature provided the Secretary with rulemaking authority to administer the initiative and referendum process:

The secretary of state is charged with the administration and enforcement of the provisions of this article relating to statewide initiated or referred measures and state constitutional amendments. The secretary of state shall have the authority to promulgate rules as may be necessary to administer and enforce any provision of this article that relates to statewide initi-

ated or referred measures and state constitutional amendments.

§ 1–40–132(1), 1B C.R.S. (1994 Supp.). It is a well established principle "that administrative regulations are presumed valid and will be set aside only when the challenging party establishes their invalidity beyond a reasonable doubt." *Urbish v. Lamm,* 761 P.2d 756, 761 (Colo.1988). Rule 17.3 provides a process for assuring an accurate determination of the number of valid signatures by actual count when the total of the number in the original petition, determined by random sampling, and the number in the addendum, determined by a line-by-line examination, ranges from more than 90% to less than 110% of the required amount. Rule 17.3 increases the accuracy of the sufficiency determination, enhances the integrity of the petition process, and assures compliance with the constitutionally prescribed minimum number of votes necessary to qualify for placement of a measure on the statewide ballot. *See* Colo. Const. art. V, § 1(2). Rule 17.3 therefore falls within the rulemaking authority prescribed by section 1–40–132(1) because of its relation to the administration and enforcement of the statewide statutory initiative scheme.

For the foregoing reasons, we reject the proponents' argument that Rule 17.3 and the signature verification procedure it prescribes violate legislative directives or exceed the Secretary's rulemaking authority.

V.

The proponents' final argument is that the district court erred in holding that certain irregularities in the petition circulators' affidavits invalidated the signatures of registered electors to which the affidavits related. First, the proponents argue that the district court improperly rejected 181 signatures because the date opposite a circulator's signature varied from the date in the notary public's acknowledgment of that signature. Second, the proponents contend that the district court erred in rejecting thirty-two signatures because a circulator's signature had been corrected without the circulator having initialled the change. Third, the proponents assert that the district court erred in reject-

ing ninety-two signatures because two notaries public omitted their notary seals from the jurat in the acknowledgments of the circulators' signatures. We affirm the first two rulings and reverse the third.

■ In *Loonan v. Woodley*, 882 P.2d 1380, 1384 (Colo.1994), we addressed the standard to be applied "in gauging adherence to statutes regulating the right of initiative and referendum." We held that "[t]he right of initiative and referendum, like the right to vote, is a fundamental right under the Colorado Constitution." *Id.* at 1383. Because of the importance of these rights, constitutional and statutory provisions governing the initiative process should be liberally construed so that the constitutional right reserved to the people " 'may be facilitated and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.' " *Id.* at 1384 (quoting *Montero v. Meyer*, 795 P.2d 242, 245 (Colo.1990)). We noted that in the voting rights context, we had held that the rule of substantial compliance provides an acceptable level of statutory compliance. *Id.* (citing *Meyer v. Lamm*, 846 P.2d 862, 875 (Colo.1993)). We concluded that "[g]iven the similar nature of the right to vote and the right of initiative and referendum, and the common statutory goal of inhibiting fraud and mistake in the process of exercising these rights, we now hold that substantial compliance is the appropriate standard to apply in the context of the right to initiative and referendum." *Loonan*, 882 P.2d at 1384. Accordingly, substantial compliance is the standard we must apply in assessing the effect of the deficiencies that caused the district court to hold invalid the petition signatures at issue in this case. *Accord In Re Proposed Initiated Constitutional Amendment "1996–3"*, 917 P.2d 1274, 1276 (Colo. 1996).

■ In determining whether initiative proponents have achieved substantial compliance, we must consider (1) the extent of noncompliance, (2) the purpose of the applicable provision and whether that purpose is substantially achieved despite the alleged noncompliance, and (3) whether there was a good-faith effort to comply or whether noncompliance is based on a conscious decision to mislead the electorate. *Loonan*, 882 P.2d at 1384 (applying by analogy the factors we adopted in *Bickel v. City of Boulder*, 885 P.2d 215, 227 (Colo.1994), to review substantial compliance under the election regulations of Article X, section 20, of the Colorado Constitution); *accord Constitutional Amendment "1996–3"*, 917 P.2d at 1276. Employing the substantial compliance standard of review, we now address the particular defects that caused the district court to hold invalid signatures that the proponents contend should have been counted as valid.

## A.

■ We first address the district court's determination that the Secretary erred in validating 181 signatures because the day or month of the circulator's signature did not correspond to the day or month of the notary public's signature.

The Colorado Constitution requires that to each initiative petition "shall be attached an affidavit of some registered elector that each signature thereon is the signature of the person whose name it purports to be and that, to the best of the knowledge and belief of the affiant, each of the persons signing said petition was, at the time of signing, a registered elector." Colo. Const. art. V, § 1(6). A petition satisfying constitutional requirements and "so verified shall be prima facie evidence that the signatures thereon are genuine and true and that the persons signing the same are registered electors." *Id.; see also* § 1–40–116(1), 1B C.R.S. (1994 Supp.). The Secretary is authorized to designate or prescribe the general form of the petitions. Colo. Const. art. V, § 1(6). The legislature also provided that "[t]o each petition shall be attached a signed, notarized, and dated affidavit executed by the registered elector who circulated the petition section," and prescribed specific content requirements for the affidavits. § 1–40–111(2), 1B C.R.S. (1994 Supp.). The Secretary incorporated all constitutional and legislative requirements into the affidavit form executed by the circulators in this case. That form required the circulator to indicate the date

that the circulator signed the affidavit and included a jurat stating that the affidavit was "[s]ubscribed and sworn to before me this ___ day of ____ 19__."

We specifically considered an affidavit form that included these requirements in *Committee For Better Health Care v. Meyer*, 830 P.2d 884, 898 (Colo.1992). We addressed the effect of a discrepancy between the date of the circulator's signature and the date on the notary's affirmation:

> Correspondence of the dates on a circulator affidavit and on the prescribed affirmation form provides a strong basis for the conclusion that a signature purporting to be that of a circulator is in fact that circulator's signature and that the circulator in fact witnessed the petitioners' execution of the corresponding petition. Conversely, a discrepancy in those two dates establishes that the circulator did not sign the circulator affidavit in the presence of the notary, thus presenting an irregularity in the initiative process. Such irregularity would in most circumstances amply justify initial administrative rejection of the petition in question.

*Id.* (citations omitted). If the dates do not correspond, however, the proponents can introduce evidence that the circulator did sign and swear to the affidavit in the presence of the official who administered the oath. *McClellan v. Meyer*, 900 P.2d 24, 34 (Colo. 1995); *Committee For Better Health Care*, 830 P.2d at 899.

■ In the present case, the district court held that differences in the day or month of the circulator's date of signing and the date of the notary's acknowledgement served to invalidate 181 signatures. The district court held:

> There is nothing in the record which explains the discrepancies in day or month. Therefore, the Court must conclude that the circulator did not execute the petition before the notary public if the day or

month in the affidavit differ from the day or month in the acknowledgement.

We agree with the district court that discrepancies in the day or month of the circulator's date of signing and the date of notary acknowledgement render the relevant petitions invalid absent evidence that explains the differences in question, and that petitions containing such discrepancies do not provide the necessary safeguards against abuse and fraud in the initiative process. The Secretary erred in reaching a contrary conclusion. *See McClellan*, 900 P.2d at 34; *Committee For Better Health Care*, 830 P.2d at 898. As a result, we affirm the district court's determination that 181 signatures were invalid because of discrepancies between the day or month of the circulator's date of signing and the date of the notary's acknowledgement.

### B.

■ The district court also properly reversed the Secretary's determination and rejected a petition that contained an altered date next to the circulator's signature where the change was not initialed by the circulator. The court rejected one petition, containing thirty-two signatures, because "the Court cannot determine whether the circulator authorized or personally made the [date of signing] change."[6] The proponents argue that because the district court could not determine whether the circulator authorized or personally changed the date of signing, the protestors did not meet the burden of proof imposed upon them by section 1–40–119, 1B C.R.S. (1994 Supp.). The proponents also argue that dates of any kind next to the circulators' signatures are not a constitutional requirement, and therefore should not be mandatory.

■ We agree with the district court's determinations. First, the proponents' burden of proof argument is misplaced. Section 1–40–119, 1B C.R.S. (1994 Supp.), "merely requires any party disagreeing with an initial administrative determination to justify that

---

6. The court then held that in contrast the signatures in a similar petition were valid, because (1) the circulator had initialled the date change, and (2) "the pen that was used by the notary public was the same pen used to change the date,"

evidencing the notary's presence when the changes were made and providing assurance that the circulator's date of signing corresponded in fact with the notary's date of acknowledgement.

party's protest." *Committee for Better Health Care*, 830 P.2d at 895 n. 13. The protestors satisfied this burden when the district court held that it could not determine based on the altered date of signing whether the circulator complied with the statutory date of signing requirements. Since "[o]nly properly verified petitions are subject to the presumption of prima facie validity established by article V, section 1(6), of the Colorado Constitution," *Committee for Better Health Care*, 830 P.2d at 895, it is the proponents, and not the protestors in this case, that bear the burden of showing that substantial compliance occurred, *see Loonan*, 882 P.2d at 1384.

■ Second, the district court found that the date next to the circulator's name was altered without being initialed by the circulator. Although the constitution does not require that a date accompany a circulator's signature, section 1–40–111(2) affirmatively requires that the circulator's affidavit include "the date he or she signed the affidavit." § 1–40–111(2), 1B C.R.S. (1994 Supp.). The dating requirement in section 1–40–111(2) is aimed at preventing abuse, mistake, or fraud in the initiative process. *Committee for Better Health Care*, 830 P.2d at 893. The date of the circulator's signature is the date that signature was "[s]ubscribed." A variance between that date and the date the notary states the signature was "[s]ubscribed" casts doubt on whether the circulator indeed signed the affidavit in the notary's presence. In *Committee for Better Health*

*Care*, we held that such discrepancies in dates generally present "an irregularity in the initiative process" that justify rejection of the petition signatures in question. *See id.* at 898; *see also* Rules 14.4.2, 15.3.2, 8 C.C.R. 1505–1 (1993).[7] We hold today that absent evidence that the change in signing date was the product of the signing party, changes to a circulator's signing date do not represent substantial compliance with section 1–40–111(2) and serve to invalidate the signatures contained within the affected petitions.[8] *See Committee for Better Health Care*, 830 P.2d at 898.

In sum, the district court properly reversed the Secretary and held invalid thirty-two signatures that were tainted by a change in the circulator's date of signing, where the date of signing was not accompanied by the initials of the circulator or other evidence in the record establishing that the circulator made the change.[9]

### C.

The proponents' final contention is that the district court erred in holding that the Secretary improperly counted signatures on petitions that did not contain a notary seal. The district court reviewed these petitions under a strict compliance standard, and then reversed the Secretary's determination of validity and invalidated ninety-two signatures that were verified by circulators' affidavits attested by a notary but lacking the notary's seal. The district court qualified its holding

---

**7.** Rule 14.4.2 concerns verification by random sampling and provides:

The notary clause at the end of the affidavit shall be checked for each entry. If any information is missing or if the date on the notary clause is not the same date as the circulator signed the affidavit, the entry shall be rejected.

Rule 14.4.2, 8 C.C.R. 1505–1 (1993). Rule 15.3.2 concerns verification of all signatures and provides:

Each petition section shall be checked to assure that the notary clause at the end of the affidavit is completed. If any information is missing or if the date on the notary clause is not the same date as the circulator signed the affidavit, all signatures on the section of the petition shall be rejected.

Rule 15.3.2, 8 C.C.R. 1505–1 (1993).

**8.** If the circulator indeed signed and swore to the affidavit on the date indicated by the notary, the

proponents could have demonstrated that fact by submitting evidence from the notary, the circulator, or any other witness to the change. *McClellan v. Meyer*, 900 P.2d 24, 34 (Colo.1995) (despite discrepancies in the circulators' dates of signing and the dates of notary acknowledgement, "the testimony and affidavits of the circulators established that they signed the circulator affidavits in the presence of a notary and no contravening evidence was presented to dispute this finding"); *see also Committee for Better Health Care v. Meyer*, 830 P.2d 884, 899 (Colo.1992). The proponents in this case did not submit such supporting evidence.

**9.** We express no opinion concerning whether the change must be made in the presence of the notary.

by noting that there was evidence in the record that the two notaries who omitted their seals were notaries at the time of signing, based in part on the court's finding that "the signatures are the same" on certain notarized affidavits containing the notary seal and on the notarized affidavits where the seal was omitted. We disagree with both the district court's use of a strict compliance standard and its ultimate determination.

The "notarized" affidavit requirement of section 1–40–111(2), 1B C.R.S. (1994 Supp.), as with other statutory requirements, is subject to a substantial compliance standard. *Loonan*, 882 P.2d at 1384. Section 1–40–111(2) requires that a notarized affidavit of the circulator accompany any initiative petition submitted to the Secretary. § 1–40–111(2), 1B C.R.S. (1994 Supp.); *see also* Rules 14.4.2, 15.3.2, 8 C.C.R. 1505–1 (1993) (quoted *supra* note 7). Furthermore, section 12–55–112(2) requires that "[u]nder or near his official signature on every notary acknowledgment, a notary public shall rubber stamp or emboss clearly and legibly his official seal." § 12–55–112(2), 5B C.R.S. (1991); *see also* § 12–55–119, 5B C.R.S. (1991). *But see* § 12–55–112(5), 5B C.R.S. (1991) ("The illegibility of any of the information required by this section [including the notary seal] does not affect the validity of a transaction.").

In *Committee For Better Health Care,* we noted that "[a] requirement of third-party authentication of circulator signatures is justified as a measure designed to protect the integrity of the initiative process insofar as it emphasizes the significance of the personal responsibility circulators must assume to prevent irregularities in the initiative process." 830 P.2d at 894. We held, however, that the "notarized" affidavit requirement of section 1–40–111(2) must be construed to authorize authentication by any person authorized to administer oaths, "such as judges, magistrates, referees, court clerks and deputy court clerks." *Id.* This construction found support in the constitutional provision requiring that a circulator only exe-cute an "affidavit," *see* Colo. Const. art. V, § 1(6), and was necessary to avoid impeding the initiative process by limiting to notaries public the classes of persons authorized to authenticate circulator signatures. *Committee For Better Health Care,* 830 P.2d at 894. Although a notary seal lends assurance that an official is a notary public and therefore authorized to administer oaths, we hold that substantial compliance with the authentication requirement is achieved if the status of the official as a notary public is established by other evidence in the record. Our conclusion adequately protects the integrity of the initiative process and avoids invalidation of otherwise valid signatures to an initiative petition on a technical basis when an oath was in fact administered by an official duly authorized to do so.[10]

In view of both our substantial compliance standard and the record in this case, the district court erred in invalidating petitions that did not contain a notary seal. Our decision in *Loonan* dictates three considerations in determining the existence of "substantial compliance." *Loonan,* 882 P.2d at 1384. First, nothing in the record suggests that the initiative proponents engaged in a bad-faith effort consciously to mislead the electorate by failing to secure the notary seal on a limited number of petitions. *See id.* at 1384 (court should consider any bad-faith in determining whether initiative proponents satisfy the substantial compliance standard). Second, the failure to secure notary seals on initiative petitions was not extensive in this case. *See id.* at 1384 (court should consider the extent of noncompliance in determining whether initiative proponents satisfy the substantial compliance standard). Indeed, the district court held that only ninety-two signatures were invalid due to the lack of a notary seal on two of the circulators' affidavits.

Finally, the purpose of the "notarized" affidavit provision, § 1–40–111(2), 1B C.R.S. (1994 Supp.), was "substantially achieved," *see Loonan,* 882 P.2d at 1384, despite the proponents' failure to secure a notary seal on

---

**10.** Unlike the exacting statutory compliance that we have required in the context of a tax deed, *see Dussart v. M. Abdo Mercantile Co.,* 57 Colo. 423, 427–29, 140 P. 806, 807–08 (1914), we base our decision today on the substantial compliance standard that is applicable to statutory initiative requirements, *Loonan v. Woodley,* 882 P.2d 1380, 1384 (Colo.1994).

petitions affecting ninety-two signatures. The purpose of the "notarized" affidavit provision is to prevent mistake, fraud or abuse in the initiative process by requiring "that circulators' signatures be authenticated by persons authorized to administer oaths." *Committee For Better Health Care*, 830 P.2d at 894. In this case, the district court relied on an admittedly "hypertechnical type of approach," and required strict compliance with the seal requirement of section 12–55–112(2), 5B C.R.S. (1991). The court qualified its ruling by noting:

> On the other hand too, I do want to state for the record it's quite clear that there is evidence in the record that these two [notaries that omitted their seals] . . .—
>
> . . . .
>
> . . . did have the capacity as a notary at the time and that as far as I'm concerned—and I've seen enough of these [notaries'] names over and over again, it's quite clear to me that the signatures are the same [on the notarized affidavits containing the notary seal and on the notarized affidavits where the seal was omitted].

The district court correctly noted that the record contains evidence that the affidavits with omitted seals were notarized by individuals with the same signature and commission expiration found on other affidavits with proper seals. In view of the record in this case, and the district court's erroneous reliance on a strict compliance standard, we reverse the district court's determination that ninety-two signatures were invalid due to the notary's failure to affix a notary seal.

We also reject the protestors' argument that our decision today will create the imminent threat of roving notary impersonators. Before the Secretary or a district court accepts an affidavit to validate petition signatures, the proponents must submit adequate evidence that any person who purports to act as a notary but fails to affix the notarial seal was qualified to act in that capacity. Furthermore, "[a]ny person who acts as, or otherwise willfully impersonates, a notary public while not lawfully appointed and commissioned to perform notarial acts is guilty of a class 2 misdemeanor." § 12–55–117, 5B

C.R.S. (1991); *see also* § 12–55–118, 5B C.R.S. (1991). Section 12–55–117 provides an additional safeguard to ensure that mistake, fraud, or abuse in the initiative process will not occur as the result of our decision.

## VI.

On cross-appeal, the protestors argue that the district court erred in reversing the Secretary's determination and holding that a signed circulator affidavit is sufficient where the circulator omitted the date of signing on the affidavit altogether. We disagree.

■ Initiative proponents must substantially comply with the requirement in section 1–40–111(2) that circulators submit petitions accompanied by notarized affidavits, including "the date [the circulator] signed the affidavit." § 1–40–111(2), 1B C.R.S. (1994 Supp.). The "Affidavit[s] of Circulator" distributed by the Secretary to the proponents in this case required a notary to affirm that the circulators' affidavits were "[s]ubscribed and sworn to before me." In the event that the day or month in the date of the notary verification and the circulator's date of signing differ, the notary's acknowledgment that the circulator's affidavit was "[s]ubscribed and sworn to before me" may not be correct, presenting a "discrepancy" and corresponding "irregularity" in the initiative process that generally precludes the validation of the relevant petition to avoid fraud, abuse or mistake in the initiative process. *Committee For Better Health Care*, 830 P.2d at 898; *see also supra* part V(A). No such conflict is presented when the circulator simply omits the date of signing. In such a case, there is no reason to believe that the affidavit was not both "[s]ubscribed and sworn to" before the notary public on the date indicated in the jurat.

■ In concluding that the initiative proponents substantially complied with the requirements for a circulator's affidavit even though the circulator did not include a date of signing, we are guided by three considerations. *See, e.g., Loonan*, 882 P.2d at 1384. Because (1) the purpose of third party verification of a circulator's date of signing is satisfied by the notary's acknowledgement

that the affidavit was "[s]ubscribed and sworn to before me" where nothing in the record, such as a discrepancy in dates, casts doubt upon the notary's affirmation, (2) the lack of any date of signing affected only one circulator's affidavit in this case and was not extensive, and (3) nothing in the record evidences a lack of good faith on the proponents' part in failing to include a date of signing on one circulator affidavit, we hold that the proponents in this case substantially complied with section 1–40–111(2) despite the omission of a date of signing on one circulator affidavit. In view of this substantial compliance, we agree with the district court that the Secretary erred in invalidating the affected signatures.

## VII.

The proponents' initiative petition contains thirty-eight signatures more than the minimum amount necessary for inclusion on the 1994 statewide ballot. The protestors properly sought direct review in district court of the Secretary's sufficiency determination, pursuant to sections 1–40–118 and 1–40–119, 1B C.R.S. (1994 Supp.), without first exhausting the administrative remedies outlined in section 1–40–132(1), 1B C.R.S. (1994 Supp.). We also agree with the protestors that the Secretary did not err in relying on Rule 17.3, 8 C.C.R. 1505–1 (1993), to determine the total number of valid petition signatures after the proponents submitted additional signatures by addendum in response to the Secretary's initial determination of insufficiency.

We reiterate today that the proper standard in evaluating whether statutory requirements have been satisfied in matters affecting the right to initiative is one of substantial compliance. Although the district court did not err in invalidating petition signatures where the date opposite a circulator's signature varied from the date in the notary's acknowledgement of that signature, and the district court properly rejected petition signatures where a circulator's signature was corrected without the circulator having initialled the change, we disagree with the district court and the protestors that circulator affidavits without a notary seal are invalid where evidence in the record indicates that authorized notaries public administered the affidavits in question. We also disagree with the protestors that the district court erred in holding that a signed circulator affidavit is sufficient where the circulator omitted the date of signing on the affidavit altogether. The district court concluded that the initiative fell fifty-four signatures short of the constitutionally required minimum, but the result of our decision today is that the petition contains thirty-eight signatures more than that constitutional threshold for inclusion on the 1994 ballot.

We therefore affirm the district court in part, reverse the district court in part, and remand the case to the district court for further proceedings consistent with this opinion.