Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 23, 2018
**AS MODIFIED MAY 14, 2018**

**2018 CO 30M**

**No. 18SA176, <u>Kuhn v. Williams</u> — Election Law.**

In this expedited appeal under section 1-1-113(3), C.R.S. (2017), the supreme court addresses whether the Colorado Secretary of State ("the Secretary") may certify incumbent Representative Doug Lamborn to the 2018 Republican primary ballot for Colorado's Fifth Congressional District. Relying solely on the Colorado Election Code, the supreme court concludes he may not.

The supreme court holds that although the Secretary properly relied on the circulator's affidavit and information in the voter registration system in verifying the petition and issuing a statement of sufficiency, the Petitioners nonetheless had the statutory right to challenge the validity of the petition under sections 1-4-909 and 1-1-113, C.R.S. (2017), before the Secretary certified Representative Lamborn's name to the ballot. The Petitioners properly presented additional evidence to the district court in challenging the actual residence of the petition circulators.

The supreme court concludes the district erred when it focused on the challenged circulator's subjective intent to move back to Colorado, rather than the test set forth in section 1-2-102, when determining the challenged circulator's residency. In applying

the correct test to the essentially undisputed facts here, the supreme court concludes that the challenged circulator was not a resident of Colorado when he served as a circulator for the Lamborn Campaign. Accordingly, the supreme court reverses the district court's ruling to the contrary. Because the challenged circulator was statutorily ineligible to serve as a circulator, the signatures he collected are invalid and may not be considered. That causes the Lamborn Campaign's number of signatures to fall short of the 1000 required to be on the Republican primary ballot. Therefore, the supreme court holds that the Secretary may not certify Representative Lamborn to the 2018 primary ballot for Colorado's Fifth Congressional District.

The supreme court does not address the Lamborn Campaign's arguments regarding the constitutionality of the circulator residency requirement in section 1-4-905(1), because the supreme court lacks jurisdiction to address such claims in a proceeding under section 1-1-113.

## The Supreme Court of the State of Colorado
2 East 14th Avenue • Denver, Colorado 80203

### 2018 CO 30M

### Supreme Court Case No. 18SA176
*Appeal Pursuant to § 1-1-113(3), C.R.S. (2017)*
District Court, City and County of Denver, Case No. 18CV31151
Honorable Brian R. Whitney, Judge

### Petitioners-Appellants:

Michael Kuhn, Ashlee Springer, Lydia K. Honken, Jeremy Isaac, and Sharon M. Schafer,

v.

### Respondent-Appellee:

Wayne W. Williams, in his official capacity as the Colorado Secretary of State,

and

### Intervenor-Appellee:

Lamborn for Congress.

### Order Reversed
*en banc*
April 23, 2018

### Opinion modified, and as modified, petition for rehearing DENIED. EN BANC.

### May 14, 2018

**Attorneys for Petitioners-Appellants:**
Statecraft PLLC
Michael Francisco
  *Colorado Springs, Colorado*

**Attorneys for Respondent-Appellee:**
Cynthia H. Coffman, Attorney General
LeeAnn Morrill, First Assistant Attorney General
Matthew D. Grove, Assistant Solicitor General
Emily Buckley, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Intervenor-Appellee:**
Hale Westfall LLP
Ryan R. Call
Richard A. Westfall
  *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Legislators:**
Lewis Roca Rothgerber Christie LLP
Thomas M. Rogers III
Dietrich C. Hoefner
Hermine Kallman
  *Denver, Colorado*

**Attorneys for Amici Curiae Ted Harvey, Senator Jerry Sonenberg, Senator John Cook, and Greg Brophy:**
Klenda Gessler & Blue
Geoffrey N. Blue
Scott E. Gessler
  *Denver, Colorado*

**PER CURIAM**

¶1    In this expedited appeal under section 1-1-113(3), C.R.S. (2017), we address whether the Colorado Secretary of State ("the Secretary") may certify incumbent Representative Doug Lamborn to the 2018 Republican primary ballot for Colorado's Fifth Congressional District. Relying solely on the Colorado Election Code, we conclude he may not.[1]

¶2    A major-party candidate in a partisan election may seek access to the primary ballot either through the party assembly process or by petition. Lamborn for Congress (hereinafter the "Lamborn Campaign"), the authorized federal campaign committee of Representative Doug Lamborn, chose the latter. Under section 1-4-801(2)(b), C.R.S. (2017), of the Colorado Election Code, he needed 1000 verified signatures from registered Republicans in the Fifth Congressional District to qualify for the ballot. His campaign hired an organization to circulate petitions and obtain the requisite signatures. The campaign then submitted the petition and signatures to the Secretary for review and verification.

¶3    After completing his review, the Secretary determined that the Lamborn Campaign had submitted 1269 valid signatures, so he issued a statement of sufficiency pursuant to section 1-4-908(3), C.R.S. (2017). Shortly thereafter, Petitioners filed a petition in the district court under sections 1-1-113(1) and 1-4-909(1), C.R.S. (2017),

---

[1] We emphasize at the outset the narrow nature of our review under section 1-1-113. We do not address the Lamborn Campaign's arguments challenging the constitutionality of Colorado's circulator residency requirement because such claims exceed this court's jurisdiction in a section 1-1-113 action. We therefore express no opinion on the constitutionality of the residency requirement in section 1-4-905(1), C.R.S. (2017).

protesting the Secretary's finding of sufficiency on grounds that several of the Lamborn Campaign's petition circulators were not bona fide residents of Colorado, as required by section 1-4-905(1) of the Election Code.

¶4 On April 10, 2018, the district court held a hearing on the Petitioners' claims. Petitioners asserted, in part, that it would be a breach or neglect of duty under section 1-4-908(3) for the Secretary to certify Representative Lamborn's name to the primary election ballot if the necessary signatures were not collected by Colorado residents. Petitioners' arguments to the district court focused principally on two circulators: Jeffrey Carter and Ryan Tipple. Following a hearing, the district court concluded that Carter was not a resident, and therefore invalidated the 58 signatures he collected. No party challenges that ruling.

¶5 This appeal focuses on the 269 signatures gathered by Tipple. Without those signatures, Representative Lamborn does not have enough signatures to qualify for the ballot. The district court concluded that Tipple's stated long-term intent to become a resident of Colorado satisfied the circulator residency requirement. Because the signatures Tipple collected meant that the Lamborn Campaign had satisfied the statutory threshold, the court denied Petitioners' request for relief and upheld the Secretary's finding of sufficiency. Petitioners appealed to us under section 1-1-113(3), and we exercised our discretion to review the district court's ruling.

¶6 We reverse. Although the Secretary properly relied on the circulator affidavits and information in the statewide voter registration system in reviewing the sufficiency of the petition, section 1-4-909(1) of the Election Code nevertheless affords a narrow

opportunity to challenge the validity of a candidate's petition before the Secretary certifies the candidate to the ballot. Petitioners properly availed themselves of that opportunity and challenged the residency of some of the petition circulators for the Lamborn Campaign, including Tipple. We reverse the district court's ruling that Tipple is a resident of Colorado. The district court improperly focused on Tipple's stated future intent to move to Colorado, rather than considering whether Tipple presently has a primary or principal place of abode in Colorado to which he intends to return, as confirmed by objective indicia of such residency.

## I. Facts and Procedural History

¶7    We start by identifying the parties. Intervenor Lamborn for Congress (hereinafter the "Lamborn Campaign") is the authorized federal campaign committee of Doug Lamborn, the incumbent representative for Colorado's Fifth Congressional District ("CD5"). Representative Lamborn is a Republican, seeking reelection for a seventh term. Petitioners Michael Kuhn, Ashlee Springer, Lydia K. Honken, Jeremy Isaac, and Sharon M. Schafer are registered voters from CD5 (collectively referred to as "the protesters"). Respondent Wayne Williams is the Colorado Secretary of State.

¶8    In Colorado, major-party candidates can qualify for the primary ballot through the traditional party caucus and assembly process, § 1-4-601, C.R.S. (2017), or by gathering signatures of electors on a petition. § 1-4-801, C.R.S. (2017). The Lamborn Campaign, on behalf of Representative Lamborn, used the petition process to seek access to the primary ballot.

5

¶9     Colorado law requires that a major-party candidate in a partisan election seeking to petition onto the primary ballot must present to the Secretary at least 1000 signatures (or 30% of the votes cast at the preceding primary election, if fewer than 1000), from electors registered in their district, § 1-4-801(2)(b), who are affiliated with the candidate's party, § 1-4-904(2)(a), C.R.S. (2017).

¶10    Section 1-4-905(1) outlines several requirements of the people collecting the signatures, known as circulators:

> No person shall circulate a petition to nominate a candidate unless the person is a <u>resident of the state</u>, a citizen of the United States, at least eighteen years of age, and, for partisan candidates, registered to vote and affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system.

(Emphasis added.)   Additionally, for each petition section, a circulator must attach a signed, notarized, and dated affidavit that includes, among other information, "<u>a statement that the affiant was a resident of the state</u>, a citizen of the United States, and at least eighteen years of age at the time the section of the petition was circulated and signed by the listed electors."  § 1-4-905(2), C.R.S. (2017) (emphasis added).  Finally, the designated election official "shall not accept for filing any section of a petition which does not have attached to it the notarized affidavit required by this section." § 1-4-905(3), C.R.S. (2017).

¶11    On March 6, 2018, the Lamborn Campaign submitted 1783 signatures to the Secretary.

¶12    On March 29, 2018, the Secretary issued a statement of sufficiency, finding 1269 of the signatures were from eligible and registered CD5 Republican voters.   Under

6

section 1-4-909(1), if a petition that appears to be sufficient is not challenged within five days of the statement of sufficiency being issued, it is deemed valid.

¶13 After noticing that six of the circulators with different last names all listed the same address in Thornton as their permanent residence, the protesters investigated the veracity of the circulators' representations regarding their ties to Colorado.

¶14 On April 3, 2018, the protesters filed a verified petition in Denver District Court under sections 1-1-113(1) and 1-4-909(1), alleging seven of the Lamborn Campaign's circulators did not meet the statutory residency requirements under section 1-4-905.[2] As a result, the protesters claim, it would be a breach or neglect of duty under section 1-4-908(3) for the Secretary to certify Representative Lamborn's name to the primary election ballot.

¶15 On April 10, 2018, the district court held a hearing on the protesters' claims. The day before the hearing, the Lamborn Campaign filed a motion to intervene, which the district court granted. At the hearing, the protesters presented evidence regarding the residency of seven of the circulators at the time they circulated petitions for the Lamborn Campaign.

¶16 Tipple testified by phone (because he was closing on a house that day in California). Under oath, he shared the following facts:

---

[2] The protesters do not question the identity of the circulators, their status as U.S. citizens, their ages, their compliance with the affidavit requirements, or their status as registered Republicans in Colorado's statewide voter registration system before they collected the signatures in question. The protesters also do not challenge the validity of the signatures obtained by the circulators.

- In 2008, he and his wife and their daughter moved to Colorado, where his wife had grown up, and they "realized that's where [they] would like to stay." Tipple's in-laws live in Colorado Springs. While living in Colorado, Tipple and his wife had a boy they named "Breck," after the town of Breckenridge, Colorado.

- In 2008 and 2009, the economic slowdown caused Tipple's employer to reassign him to a project in Texas. His company subsequently moved him around the country for various projects, during which time Tipple made occasional trips to Colorado, at least once for work.

- Around 2016, Tipple was laid off.

- Since at least 2016, Tipple has lived in Ventura, California with his wife and four children. Most of Tipple's personal property is located in the Ventura home.

- Since 2016, Tipple has worked as a house flipper in California. He also drives for Lyft and Uber in California.

- In 2017, Tipple paid taxes as a resident in California. Tipple acknowledged that last year he spent the "overwhelming majority" of his time working in California.

- In January 2018, Tipple owned two cars registered in California and had a California driver's license with an expiration date in November 2018. He did not have a Colorado driver's license when he circulated the petition.

- He is registered to vote in California.

- He and his family spend the vast majority of their time in California. He "might have" spent 30 days in Colorado last year.

- Tipple came to Colorado on a round-trip ticket scheduled for January 15 to January 26, 2018, during which time he worked as a circulator for the Lamborn Campaign. While doing so, he stayed with his in-laws.

¶17 Tipple registered to vote in Colorado on May 9, 2016 (when he was in Colorado for an earlier stint as a circulator). For his Colorado voter registration, Tipple listed his in-laws' house in Colorado Springs as his primary residence.

¶18 Tipple testified he would like to move to Colorado, if he could secure long-term employment here. When discussing his job flipping houses, he said, "[I]deally I would

8

be able to do that back in Colorado . . . ." When asked whether he was mistaken in claiming Colorado residence, Tipple testified, "Well, I—I consider myself more a resident of Colorado in—in the long-term, uh, since having moved there in 2008." The Secretary asked whether Tipple considered himself a Colorado resident at the time he circulated the petition, to which Tipple responded: "Uh, as—as I mentioned earlier, uh—in—in a long-term sense, yes."

¶19 Ruling from the bench, the district court denied the relief requested by the protesters. The district court looked at whether "the circulators were in substantial compliance with the . . . election laws." The district court summarized its perception of the relevant law as, "What really governs under the—under the liberal reading of the election laws is the person's intent when they sign up to be a voter here in Colorado. Their intent to make Colorado their permanent home."

¶20 The district court concluded that five of the challenged circulators met Colorado's residency requirements, because they testified that when they registered to vote they intended to stay in Colorado, and they did not immediately leave the state after concluding their work for the Lamborn Campaign.

¶21 The district court found the other two circulators more problematic. The district court found by a preponderance of the evidence that one of the circulators, Jeffrey Carter, "wasn't, for the purposes of [the] statute, a registered voter" because, despite professing an intent to live in Colorado, at the relevant time he was actually looking for a job in Missouri while also traveling around the country working as a circulator. Having determined that Carter was not a resident of Colorado when he served as a

9

circulator, the district court struck the 58 signatures collected by Carter. This brought down the Lamborn Campaign's valid signature total down to 1211 signatures. No party challenges the district court's ruling as to Carter.

¶22 As for Tipple, the district court began by noting Tipple's family ties to Colorado. The district court then focused on Tipple's subjective intent to live in Colorado again in the future. It noted that "he had every intent of . . . becoming a resident of the state of Colorado. He just hadn't done so then." The court also observed that "at the time that he was circulating petitions, Mr. Tipple fits the definition of what would fit a registered voter. Someone who is attempting to move to the state of Colorado." The court concluded that Tipple was a resident and refused to strike the signatures collected by Tipple.

¶23 Because it found more than 1000 signatures to be valid, the district court denied the protesters' request to order the Secretary to refrain from certifying Representative Lamborn's name to the primary ballot.

¶24 On April 13, 2018, the protesters asked this court to review the district court's determination. The protesters argue the district court erred by using an incorrect test to determine the circulator's residency.

¶25 We accepted jurisdiction.[3]

---

[3] We exercised our jurisdiction to address the following reframed issues:
1. [REFRAMED] What sources of information must the Colorado Secretary of State review to confirm a circulator's residency in evaluating the sufficiency of a major party candidate's petition to be on the ballot in a partisan election?

## II. Standard of Review

¶26 In reviewing the district court's order, we defer to a district court's findings of fact if they are supported by the record, Jones v. Samora, 2014 CO 4, ¶ 14, 318 P.3d 462, 467, and we review the district court's legal determinations de novo, Hanlen v. Gessler, 2014 CO 24, ¶ 33, 333 P.3d 41, 48.

## III. Analysis

¶27 We first consider what sources of information the Secretary must use to verify a major-party candidate petition in a partisan election. Sections 1-4-905(1) and 1-4-908(1) require the Secretary to compare the petition information against voter registration records to verify the petition. Section 1-4-905(3) also forbids the Secretary from accepting any section of a petition that does not have attached to it the notarized circulator affidavit required by section 1-4-905(2). Finally, section 1-4-908(1.5) requires the Secretary to compare each signature on a candidate petition with the signature of the eligible elector stored in the statewide voter registration system. Here, the Secretary properly relied on the information in the statewide voter registration system and the

---

2. [REFRAMED] If the Colorado Secretary of State properly certifies the sufficiency of a major party candidate's petition to be on the ballot in a partisan election, may the Petitioners nonetheless seek, through a proceeding under C.R.S. § 1-1-113, to challenge the residency status of a circulator?

3. [REFRAMED] If the Petitioners may challenge the residency status of a circulator through a proceeding under C.R.S. § 1-1-113 after the Colorado Secretary of State has properly certified the sufficiency of the petition, should the reviewing court consider the circulator's subjective intent regarding residency or instead rely merely on C.R.S. § 1-2-102 in assessing the residency of the circulator?

circulator affidavits in reviewing the sufficiency of the petition. The Secretary is neither obligated nor equipped to do more.

¶28 The question then becomes whether the review process must end there. In other words, does section 1-1-113 allow a protester to challenge the underlying validity of the information on which the Secretary legitimately relied? We answer that question in the affirmative. Section 1-4-908(3) provides that upon determining that the petition is sufficient, the designated election official "shall certify the candidate to the ballot"—but only "after the time for protest has passed." Section 1-4-909(1) expressly provides that after a candidate petition "has been verified and appears to be sufficient," a petition pursuant to section 1-1-113 "for a review of the validity of the [candidate] petition" may be filed with the district court within five days after the election official issues a statement of sufficiency. In the section 1-1-113 proceeding, a protester may present additional evidence as to a circulator's compliance with the strictures of section 1-4-905. In other words, the protesters here had a narrow opportunity to probe whether Tipple really was a Colorado resident when he acted as a circulator for the Lamborn Campaign.

¶29 Because the protesters timely challenged the validity of Tipple's residency, we turn to whether the district court erred by focusing almost exclusively on the circulator's subjective intent to move back to Colorado. We conclude that it did err, and that it should have instead considered whether Tipple already had a primary or principal place of abode in Colorado to which he presently intended to return, as confirmed by objective indicia of such residency. In examining the essentially

12

undisputed facts before us here, we conclude that Tipple was not a Colorado resident when he acted as a circulator for the Lamborn Campaign.

## A. The Secretary Properly Relied on Information in the Statewide Voter Registration System and Circulator Affidavits in Verifying the Candidate-Nomination Petition

¶30 Each candidate-nomination petition must include a signed, notarized, and dated affidavit executed by the person who circulated the petition. § 1-4-905(2). That affidavit must include, among other things, the circulator's address and a statement that the circulator was a resident of the state at the time he circulated the petition signed by the listed electors. Id. The designated election official shall not accept for filing any section of a petition that does not have attached to it the notarized affidavit required by this section. § 1-4-905(3).

¶31 After receiving a candidate-nomination petition, the Secretary must verify the petition information, including the circulator affidavit, against voter registration records. §§ 1-4-905(1), -908(1), -908(1.5).

¶32 Section 1-4-908(1) creates this responsibility as to all petition information: "Upon filing, the designated election official for the political subdivision shall review all petition information and verify the information against the registration records, and, where applicable, the county assessor's records." (Emphasis added.) For all petitions, the Secretary must also verify the collected signatures. § 1-4-908(1.5). The Secretary must compare the collected signatures against the signatures of eligible electors stored in the statewide voter registration system. Id.

13

¶33    Section 1-4-905(1) echoes this responsibility as to the voter registration and party affiliation of circulators:

> No person shall circulate a petition to nominate a candidate unless the person is a resident of the state, a citizen of the United States, at least eighteen years of age, and, for partisan candidates, registered to vote and affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system.

(Emphases added.) The affidavit required by section 1-4-905(2) supplies the facial information verifying a circulator's residency.  Section 1-4-905(2) requires the circulator to provide "a signed, notarized, and dated affidavit," containing, among other information, that the circulator "was a resident of the state" at the time the section of the petition was circulated.  Under section 1-4-905(3), the election official shall not accept any petition section that does not have attached a notarized affidavit containing the information required by section 1-4-905(2).

¶34    After receiving a petition, the Secretary subjects it to a paper review.  In conducting that paper review, the Secretary properly relies on the voter registration database information and the affidavit provided by the circulator.  As a practical matter, the Secretary's office is not equipped to further investigate residency or other requirements.

¶35    Here, the protesters do not dispute that the Secretary followed the appropriate verification procedures to do a facial verification of Tipple's information.  Instead, they look to the courts for vindication.  So, we must address whether judicial review of the Secretary's decision is allowed under section 1-1-113.

14

## B. The Protesters May Challenge a Circulator's Residency in a Section 1-1-113 Proceeding

¶36 The protesters have sought to challenge Tipple's status as a Colorado resident (and thus, the validity of the Lamborn Campaign's petition) through a section 1-1-113 proceeding. Section 1-1-113(1) states, in relevant part, the following:

> When any controversy arises between any official charged with any duty or function under this code and any candidate, or any officers or representatives of a political party, or any persons who have made nominations or when any eligible elector files a verified petition in a district court of competent jurisdiction alleging that a person charged with a duty under this code has committed <u>or is about to commit a breach or neglect of duty or other wrongful act</u>, after notice to the official which includes an opportunity to be heard, upon a finding of good cause, the district court shall issue an order requiring substantial compliance with the provisions of this code.

(Emphasis added.) Here, the Secretary properly relied on the circulator affidavit and information in the voter registration database to conclude that the Lamborn Campaign's petition appeared sufficient. Thus, the question becomes whether the Secretary has another relevant duty he might be "about to" breach or neglect, or some other relevant wrongful act in which he might be "about to" engage. <u>Id.</u>

¶37 Section 1-4-908(3) states that upon determining that the petition is sufficient, the Secretary "shall certify the candidate to the ballot." Section 1-4-908(3) thus imposes a separate duty on the Secretary to place a candidate's name on the ballot. But that provision also makes clear that he may take that step only "<u>after the time for protest has passed</u>." <u>Id.</u> (emphasis added).

¶38 That protest procedure appears in section 1-4-909(1) ("Protest of designations and nominations"):

15

> A petition . . . that has been verified and <u>appears to be sufficient</u> under this code <u>shall be deemed valid unless a petition for review of the validity of the petition pursuant to section 1-1-113 is filed with the district court within five days</u> after the election official's statement of sufficiency is issued . . . .

(Emphases added.) Thus, the Election Code expressly contemplates that, within a narrow, five-day window after the election official issues a statement of sufficiency, a challenge to the "validity of the petition" may be brought through a proceeding under section 1-1-113, before the election official certifies a candidate to the ballot. Should the court determine that the petition is not in compliance with the Election Code, the election official would certainly "commit a breach or neglect of duty or other wrongful act," § 1-1-113(1), to nonetheless certify that candidate to the ballot under section 1-4-908(3).

¶39 The Secretary and the Lamborn Campaign argue that the district court's review under section 1-1-113 is limited to whether the Secretary technically complied with section 1-4-905(1) and section 1-4-908(1). Under their argument, the district court may not consider any extrinsic evidence regarding residency, because the Secretary's duty is fulfilled upon verifying the information provided by the circulators against voter registration records and the circulator affidavit. In contrast, the protesters argue that section 1-4-909(1) permits "review of the validity of the petition," and therefore, they may present evidence demonstrating that a petition actually fails to comply with the Election Code, even if it "appear[ed] to be sufficient" in a paper review. § 1-4-909(1).

16

¶40 We agree with the protesters. Both the protest procedure outlined in section 1-4-911, C.R.S. (2017), and our precedent dictate that the district court can consider additional evidence when reviewing the validity of a candidate-nomination petition.

¶41 Section 1-4-911 states that the "party filing the protest has the burden of sustaining the protest by a preponderance of the evidence." It also provides that the "decision upon matters of substance is open to review, if prompt application is made, as provided in section 1-1-113." And as the protesters observe, this court has long rejected a narrow definition of the phrase "matters of substance." In Leighton v. Bates, electors brought a challenge to the validity of a party nominee under a predecessor statutory scheme similar to that at issue here. 50 P. 856, 856–57 (Colo. 1897). In Leighton, the district court held, much as the Secretary now argues, that the district court's jurisdiction was "strictly limited to a review of the case as made before the county clerk, and upon a certified copy of the proceedings before him; and that the court could not take any additional evidence, or try the case de novo." Id. at 857. We reversed the district court. We held that "matters of substance" required the district court to hear evidence and review the election official determinations de novo. Id. at 857–58.

¶42 In other election contexts, we have similarly clarified that judicial review includes the taking of evidence. For example, in analogous municipal election cases we have held that judicial review can include the taking of evidence. See, e.g., Gordon v. Blackburn, 618 P.2d 668, 670 (Colo. 1980) (holding in a proceeding under section 31-10-1305, C.R.S. (1977), that two electors who cast contested votes in a mayoral

17

election were not residents of the municipality after considering evidence related to their residency).

¶43 The Secretary attempts to distinguish the cases in which courts have probed into an individual's residency status by arguing that those cases involved circumstances in which a candidate's nomination petition had not been initially verified by the Secretary; whereas here the Lamborn Campaign's petition had been verified, and the protesters are seeking to invalidate his verified petition. The Secretary argues that "any asymmetry between the situation that we have here, in which the Secretary has complied with § 1-4-905(1) and § 1-4-908(1), and cases in which a petition is initially deemed insufficient or whose sufficiency is allegedly the product of fraudulently procured signatures, is a consequence of the liberal construction of the election code that § 1-1-103 requires."

¶44 But these attempts to distinguish our precedent are unpersuasive. Section 1-1-103, C.R.S. (2017), does require the Election Code to be liberally construed, but this requirement is independent from the issue of whether a protester may challenge the validity of a petition under section 1-4-909 by presenting evidence regarding an individual's residency status or other extrinsic evidence in a section 1-1-113 proceeding. Indeed, the asymmetry that the Secretary urges would permit every facially valid petition to proceed, regardless of any underlying flaws. Such an outcome could allow egregious misconduct by circulators to stand without recourse, so long as the paper review matched the statewide voter registration system. For instance, section 1-4-905(2) also requires the circulator to include a "statement that the [circulator] has

18

not paid or will not in the future pay . . . any money or other thing of value to any signer for the purpose of inducing or causing the signer to sign the petition." Under the Secretary's interpretation, so long as the signatures of both the circulator and the citizen-signer matched information in the statewide voter registration system, a protester would be unable to present extrinsic evidence in a section 1-1-113 proceeding that the circulator had paid the citizen-signer to sign the petition. We cannot agree that the General Assembly intended such a result. See Burton v. Colorado Access, 2018 CO 11, ¶ 23, ___ P.3d ___ ("We avoid interpreting a statute in a way that creates absurd results if alternative interpretations consistent with the legislative purpose are available." (quotation omitted)).

¶45    Reading sections 1-4-905 and 1-4-908 together, it is clear that the Secretary's duties proceed in the following sequential fashion: (1) upon receipt of a candidate petition, the Secretary conducts the "paper review" of the petition by relying on information in the circulator affidavit and the statewide voter registration system; (2) if the Secretary determines the petition is sufficient, the Secretary issues a statement of sufficiency; and (3) after determining that the petition is sufficient, the Secretary certifies the candidate to the ballot—but only after the time for protest has passed. Any fact-intensive inquiry into a circulator's residency status must occur in this five-day protest window in which a party, like the protesters here, may seek review of the validity of the petition under sections 1-4-909 and 1-1-113. This fact-intensive inquiry must permit protesters to bring in extrinsic evidence if that evidence calls into question

19

the validity of the paper record on which the Secretary's initial approval appropriately rested.

¶46    Here, the protesters presented additional evidence concerning the circulators' residency.  We must now determine whether the district applied the correct legal standard to determine whether Tipple was, in fact, a resident of Colorado, as required by section 1-4-905(1), when he served as a Lamborn Campaign circulator.

## C. Tipple Was Not a Resident of Colorado When He Circulated the Lamborn Campaign's Petition

¶47    So, what role, if any, does a circulator's subjective intent play in determining his residency?  During its oral ruling, the district court summarized its perception of the relevant law as, "What really governs under the—under the liberal reading of the election laws is the person's intent when they sign up to be a voter here in Colorado. Their intent to make Colorado their permanent home."  Relying almost exclusively on Tipple's testimony that he intended to live in Colorado in the future, the district court found that Tipple was a resident of Colorado at the time he served as a circulator.

¶48    The legal standard articulated and applied by the district court is reminiscent of the domicile test outlined in Theobald v. Byrns, 579 P.2d 609, 612 (Colo. 1978) ("We elect, therefore, to reject the principal-or-primary-home test, and hold that, if any of the applicants has a bona fide residence in Blue River and if he or she has the intention that Blue River is his or her domicile, which is evidenced by objective factors such as voter registration there, then that applicant's domicile is in Blue River and he or she is entitled to be a candidate on the ballot.").  However, as we described more recently in Gordon,

20

the legislature superseded the subjective test adopted in <u>Theobald</u> with a "new method for determining the legal residence of an elector." <u>Gordon</u>, 618 P.2d at 671. The legislature's current method for determining residency of electors is now set forth in section 1-2-102, C.R.S. (2017), titled "Rules for determining residency."

¶49    Section 1-2-102 establishes rules to determine an elector's residency for Colorado voter registration. We conclude the factors listed in section 1-2-102(1)(b), C.R.S. (2017), also control in determining a circulator's residency under section 1-4-905(1). We note that a person's residency is raised twice in section 1-4-905(1). First directly, because all circulators must be residents of the state; and second indirectly, because circulators for partisan candidates must be registered to vote (which implicates section 1-2-102's requirement that the person be a resident of the state). It seems reasonable to infer that the General Assembly did not seek to impose two different residency requirements through these direct and indirect references to residency in section 1-4-905(1). Thus, we conclude that the factors listed in section 1-2-102 are controlling for both references to residency in section 1-4-905(1). <u>See</u> <u>R.E.N. v. City of Colo. Springs</u>, 823 P.2d 1359, 1364 n.5 (Colo. 1992) ("<u>In pari materia</u> is a rule of statutory construction which requires the various portions of the statute to be read together with all the other statutes relating to the same subject or having the same general purpose so that the legislature's intent may be ascertained." (citation omitted)); <u>People v. White</u>, 242 P.3d 1121, 1125 (Colo. 2010) (relying on the principal-or-primary-home test in determining jury residency and noting that the test is "now expressly made applicable to motor vehicle and income tax matters as well").

21

¶50 Section 1-2-102(1)(a)(I), C.R.S. (2017), defines residency as a person's "principal or primary home or place of abode." The statute lists the following factors the court must consider to determine a person's "principal or primary place of abode":

> Business pursuits, employment, income sources, residence for income or other tax purposes, age, marital status, residence of parents, spouse or civil union partner, and children, if any, leaseholds, situs of personal and real property, existence of any other residences and the amount of time spent at each residence, and motor vehicle registration.

§ 1-2-102(1)(b). The statute states that intent can be relevant when determining that the person, when absent, has the "present intention of returning" to that home or place of abode. See § 1-2-102(1)(a)(I) ("A principal or primary home or place of abode is that home or place in which a person's habitation is fixed and to which that person, whenever absent, has the present intention of returning after a departure or absence, regardless of the duration of the absence."). Yet, as the Gordon court noted, the principal-or-primary-home test rejects a scenario in which a person can subjectively declare a second address to be his true home, without considering whether there is objective evidence supporting that declaration. Gordon, 618 P.2d at 670–71.

¶51 Thus, the district court erred as a matter of law by relying exclusively on Tipple's stated subjective intent, without considering the objective indicia of his principal or primary place of abode under section 1-2-102(1)(b), to determine Tipple's residency.

¶52 Because each of the objective factors delineated in section 1-2-102(1)(b) indicates that Colorado was not Tipple's "primary or principal place of abode," as a matter of law, Tipple was not a resident of Colorado during the time Tipple served as a circulator

22

in January 2018.  When we apply the section 1-2-102(1)(b) factors to the evidence regarding Tipple's primary place of abode, this becomes plain:

- Tipple's business pursuits, employment, and income sources (as a house flipper and Lyft and Uber driver) are in California;

- Tipple filed taxes in California last year;

- Tipple's wife and four children have lived in California since at least 2016;

- Although Tipple's in-laws are in Colorado, no evidence was presented regarding where his parents reside;

- Tipple does not appear to hold any leasehold interests in Colorado;

- Tipple owns a house in California, and the majority of his personal property is in California;

- Tipple and his family spend the vast majority of their time in California; he "might have" spent 30 days in Colorado last year; and

- Tipple's two vehicles are registered in California.

See § 1-2-102(1)(b).

¶53     Furthermore, with respect to Tipple's attempt to establish residency in Colorado for voter registration purposes, Tipple's stated intent to live in Colorado in the future is relevant only if he has a fixed habitation in Colorado to which he presently intends to return.  See § 1-2-102(1)(a)(I).  The record reveals none.  While he occasionally stays at his in-laws' home in Colorado Springs—which is the address he used to register to vote and on his affidavit—he has no legal interest in the property, nor is there any evidence to suggest that at the time he submitted his voter registration and circulated the Lamborn Campaign's petition it was his fixed habitation.  On the contrary, all of the objective record evidence regarding his residence at the time he circulated the petition

23

for the Lamborn Campaign indicates that his primary place of abode was in California. Consequently, we conclude that Tipple was not a Colorado resident when he served as a circulator for the Lamborn Campaign.

¶54 Because Tipple did not meet the statutory requirements to be a circulator, the signatures Tipple collected must be stricken from the Lamborn Campaign's candidate-nomination petition. See Loonan v. Woodley, 882 P.2d 1380, 1382 (Colo. 1994) (upholding order vacating the Secretary's determination of sufficiency and enjoining the Secretary from certifying proposed initiative to the ballot due to circulator's failure to comply with statutory requirements).[4]

## IV. Constitutional Challenge

¶55 Finally, to the extent the Lamborn Campaign challenges the constitutionality of the circulator residency requirement in section 1-4-905(1), this court lacks jurisdiction to address such arguments in a section 1-1-113 proceeding. See Frazier v. Williams, 2017 CO 85, ¶ 3, 401 P.3d 541, 542 (holding this court has jurisdiction to consider only claims

---

[4] The district court found that Tipple substantially complied with the Election Code. See § 1-1-103(3) ("Substantial compliance with the provisions or intent of [the Election Code] shall be all that is required . . . ."); Fabec v. Beck, 922 P.2d 330, 341 (Colo. 1996) (holding a court should consider the following factors in determining whether a party has substantially complied with statutory requirements: "(1) the extent of noncompliance, (2) the purpose of the applicable provision and whether that purpose is substantially achieved despite the noncompliance, and (3) whether there was a good-faith effort to comply or whether noncompliance is based on a conscious decision to mislead the electorate"). However, residency is not a mere technical requirement that is subject to substantial compliance. See, e.g., Order, Frazier v. Williams, 16SA159 (Colo. May 24, 2016) ("As to the 45 signatures collected by James Day, we conclude that the omission of an apartment number meets the standard of substantial compliance." (emphasis added)). A person either is a resident for purposes of the Election Code or he is not.

of "breach or neglect of duty or other wrongful act" <u>under the Colorado Election Code</u> when a petition is brought through a section 1-1-113 proceeding). Therefore, we express no opinion on this issue.

## V. Conclusion

¶56 In sum, although the Secretary properly relied on the circulator's affidavit and information in the voter registration system in verifying the petition and issuing a statement of sufficiency, the protesters nonetheless had the statutory right to challenge the validity of the petition under sections 1-4-909 and 1-1-113 before the Secretary certified Representative Lamborn's name to the ballot. The protesters properly presented additional evidence to the district court in challenging the actual residence of the petition circulators.

¶57 We conclude the district erred when it focused on Tipple's subjective intent to move back to Colorado, rather than the test set forth in section 1-2-102, when determining Tipple's residency. In applying the correct test to the essentially undisputed facts here, we conclude that Tipple was not a resident of Colorado when he served as a circulator for the Lamborn Campaign. Accordingly, we reverse the district court's ruling to the contrary. Because Tipple was statutorily ineligible to serve as a circulator, the signatures he collected are invalid and may not be considered. That causes the Lamborn Campaign's number of signatures to fall short of the 1000 required to be on the Republican primary ballot. Therefore, the Secretary may not certify Representative Lamborn to the 2018 primary ballot for CD5. We recognize the gravity of this conclusion, but Colorado law does not permit us to conclude otherwise.

25

¶58    Finally, we do not address the Lamborn Campaign's arguments regarding the constitutionality of the circulator residency requirement in section 1-4-905(1), because we lack jurisdiction to address such claims in a proceeding under section 1-1-113.

Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

**2018 CO 30M**

**No. 18SA176, <u>Kuhn v. Williams</u>—Election Law.**

In this expedited appeal under section 1-1-113(3), C.R.S. (2017), the supreme court addresses whether the Colorado Secretary of State ("the Secretary") may certify incumbent Representative Doug Lamborn to the 2018 Republican primary ballot for Colorado's Fifth Congressional District. Relying solely on the Colorado Election Code, the supreme court concludes he may not.

The supreme court holds that although the Secretary properly relied on the circulator's affidavit and information in the voter registration system in verifying the petition and issuing a statement of sufficiency, the Petitioners nonetheless had the statutory right to challenge the validity of the petition under sections 1-4-909 and 1-1-113, C.R.S. (2017), before the Secretary certified Representative Lamborn's name to the ballot. The Petitioners properly presented additional evidence to the district court in challenging the actual residence of the petition circulators.

The supreme court concludes the district erred when it focused on the challenged circulator's subjective intent to move back to Colorado, rather than the test set forth in section 1-2-102, when determining the challenged circulator's residency. In applying

the correct test to the essentially undisputed facts here, the supreme court concludes that the challenged circulator was not a resident of Colorado when he served as a circulator for the Lamborn Campaign. Accordingly, the supreme court reverses the district court's ruling to the contrary. Because the challenged circulator was statutorily ineligible to serve as a circulator, the signatures he collected are invalid and may not be considered. That causes the Lamborn Campaign's number of signatures to fall short of the 1000 required to be on the Republican primary ballot. Therefore, the supreme court holds that the Secretary may not certify Representative Lamborn to the 2018 primary ballot for Colorado's Fifth Congressional District.

The supreme court does not address the Lamborn Campaign's arguments regarding the constitutionality of the circulator residency requirement in section 1-4-905(1), because the supreme court lacks jurisdiction to address such claims in a proceeding under section 1-1-113.

**2018 CO 30M**

**Supreme Court Case No. 18SA176**
*Appeal Pursuant to § 1-1-113(3), C.R.S. (2017)*
District Court, City and County of Denver, Case No. 18CV31151
Honorable Brian R. Whitney, Judge

**Petitioners-Appellants:**

Michael Kuhn, Ashlee Springer, Lydia K. Honken, Jeremy Isaac, and Sharon M. Schafer,

v.

**Respondent-Appellee:**

Wayne W. Williams, in his official capacity as the Colorado Secretary of State,

and

**Intervenor-Appellee:**

Lamborn for Congress.

**Order Reversed**
*en banc*
April 23, 2018

**Modified Opinion. Marked revisions shown.**

**Attorneys for Petitioners-Appellants:**
Statecraft PLLC
Michael Francisco
  *Colorado Springs, Colorado*

**Attorneys for Respondent-Appellee:**
Cynthia H. Coffman, Attorney General
LeeAnn Morrill, First Assistant Attorney General
Matthew D. Grove, Assistant Solicitor General
Emily Buckley, Assistant Attorney General
  *Denver, Colorado*

**Attorneys for Intervenor-Appellee:**

Hale Westfall LLP
Ryan R. Call
Richard A. Westfall
  *Denver, Colorado*

**Attorneys for Amici Curiae Colorado Legislators:**
Lewis Roca Rothgerber Christie LLP
Thomas M. Rogers III
Dietrich C. Hoefner
Hermine Kallman
  *Denver, Colorado*

**Attorneys for Amici Curiae Ted Harvey, Senator Jerry Sonenberg, Senator John Cook, and Greg Brophy:**
Klenda Gessler & Blue
Geoffrey N. Blue
Scott E. Gessler
  *Denver, Colorado*

**PER CURIAM**

2

¶1 In this expedited appeal under section 1-1-113(3), C.R.S. (2017), we address whether the Colorado Secretary of State ("the Secretary") may certify incumbent Representative Doug Lamborn to the 2018 Republican primary ballot for Colorado's Fifth Congressional District. Relying solely on the Colorado Election Code, we conclude he may not.[5]

¶2 A major-party candidate in a partisan election may seek access to the primary ballot either through the party assembly process or by petition. Lamborn for Congress (hereinafter the "Lamborn Campaign"), the authorized federal campaign committee of Representative Doug Lamborn, chose the latter. Under section 1-4-801(2)(b), C.R.S. (2017), of the Colorado Election Code, he needed 1000 verified signatures from registered Republicans in the Fifth Congressional District to qualify for the ballot. His campaign hired an organization to circulate petitions and obtain the requisite signatures. The campaign then submitted the petition and signatures to the Secretary for review and verification.

¶3 After completing his review, the Secretary determined that the Lamborn Campaign had submitted 1269 valid signatures, so he issued a statement of sufficiency pursuant to section 1-4-908(3), C.R.S. (2017). Shortly thereafter, Petitioners filed a petition in the district court under sections 1-1-113(1) and 1-4-909(1), C.R.S. (2017),

_____

[5] We emphasize at the outset the narrow nature of our review under section 1-1-113. We do not address the Lamborn Campaign's arguments challenging the constitutionality of Colorado's circulator residency requirement because such claims exceed this court's jurisdiction in a section 1-1-113 action. We therefore express no opinion on the constitutionality of the residency requirement in section 1-4-905(1), C.R.S. (2017).

protesting the Secretary's finding of sufficiency on grounds that several of the Lamborn Campaign's petition circulators were not bona fide residents of Colorado, as required by section 1-4-905(1) of the Election Code.

¶4 On April 10, 2018, the district court held a hearing on the Petitioners' claims. Petitioners asserted, in part, that it would be a breach or neglect of duty under section 1-4-908(3) for the Secretary to certify Representative Lamborn's name to the primary election ballot if the necessary signatures were not collected by Colorado residents. Petitioners' arguments to the district court focused principally on two circulators: Jeffrey Carter and Ryan Tipple. Following a hearing, the district court concluded that Carter was not a resident, and therefore invalidated the 58 signatures he collected. No party challenges that ruling.

¶5 This appeal focuses on the 269 signatures gathered by Tipple. Without those signatures, Representative Lamborn does not have enough signatures to qualify for the ballot. The district court concluded that Tipple's stated long-term intent to become a resident of Colorado satisfied the circulator residency requirement. Because the signatures Tipple collected meant that the Lamborn Campaign had satisfied the statutory threshold, the court denied Petitioners' request for relief and upheld the Secretary's finding of sufficiency. Petitioners appealed to us under section 1-1-113(3), and we exercised our discretion to review the district court's ruling.

¶6 We reverse. Although the Secretary properly relied on the circulator affidavits and information in the statewide voter registration system in reviewing the sufficiency of the petition, section 1-4-909(1) of the Election Code nevertheless affords a narrow

4

opportunity to challenge the validity of a candidate's petition before the Secretary certifies the candidate to the ballot. Petitioners properly availed themselves of that opportunity and challenged the residency of some of the petition circulators for the Lamborn Campaign, including Tipple. We reverse the district court's ruling that Tipple is a resident of Colorado. The district court improperly focused on Tipple's stated future intent to move to Colorado, rather than considering whether Tipple presently has a primary or principal place of abode in Colorado to which he intends to return, as confirmed by objective indicia of such residency.

## I. Facts and Procedural History

¶7 We start by identifying the parties. Intervenor Lamborn for Congress (hereinafter the "Lamborn Campaign") is the authorized federal campaign committee of Doug Lamborn, the incumbent representative for Colorado's Fifth Congressional District ("CD5"). Representative Lamborn is a Republican, seeking reelection for a seventh term. Petitioners Michael Kuhn, Ashlee Springer, Lydia K. Honken, Jeremy Isaac, and Sharon M. Schafer are registered voters from CD5 (collectively referred to as "the protesters"). Respondent Wayne Williams is the Colorado Secretary of State.

¶8 In Colorado, major-party candidates can qualify for the primary ballot through the traditional party caucus and assembly process, § 1-4-601, C.R.S. (2017), or by gathering signatures of electors on a petition. § 1-4-801, C.R.S. (2017). The Lamborn Campaign, on behalf of Representative Lamborn, used the petition process to seek access to the primary ballot.

5

¶9 Colorado law requires that a major-party candidate in a partisan election seeking to petition onto the primary ballot must present to the Secretary at least 1000 signatures (or 30% of the votes cast at the preceding primary election, if fewer than 1000), from electors registered in their district, § 1-4-801(2)(b), who are affiliated with the candidate's party, § 1-4-904(2)(a), C.R.S. (2017).

¶10 Section 1-4-905(1) outlines several requirements of the people collecting the signatures, known as circulators:

> No person shall circulate a petition to nominate a candidate unless the person is a <u>resident of the state</u>, a citizen of the United States, at least eighteen years of age, and, for partisan candidates, registered to vote and affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system.

(Emphasis added.) Additionally, for each petition section, a circulator must attach a signed, notarized, and dated affidavit that includes, among other information, "<u>a statement that the affiant was a resident of the state</u>, a citizen of the United States, and at least eighteen years of age at the time the section of the petition was circulated and signed by the listed electors." § 1-4-905(2), C.R.S. (2017) (emphasis added). Finally, the designated election official "shall not accept for filing any section of a petition which does not have attached to it the notarized affidavit required by this section." § 1-4-905(3), C.R.S. (2017).

¶11 On March 6, 2018, the Lamborn Campaign submitted 1783 signatures to the Secretary.

¶12 On March 29, 2018, the Secretary issued a statement of sufficiency, finding 1269 of the signatures were from eligible and registered CD5 Republican voters. Under

section 1-4-909(1), if a petition that appears to be sufficient is not challenged within five days of the statement of sufficiency being issued, it is deemed valid.

¶13    After noticing that six of the circulators with different last names all listed the same address in Thornton as their permanent residence, the protesters investigated the veracity of the circulators' representations regarding their ties to Colorado.

¶14    On April 3, 2018, the protesters filed a verified petition in Denver District Court under sections 1-1-113(1) and 1-4-909(1), alleging seven of the Lamborn Campaign's circulators did not meet the statutory residency requirements under section 1-4-905.[6] As a result, the protesters claim, it would be a breach or neglect of duty under section 1-4-908(3) for the Secretary to certify Representative Lamborn's name to the primary election ballot.

¶15    On April 10, 2018, the district court held a hearing on the protesters' claims. The day before the hearing, the Lamborn Campaign filed a motion to intervene, which the district court granted. At the hearing, the protesters presented evidence regarding the residency of seven of the circulators at the time they circulated petitions for the Lamborn Campaign.

¶16    Tipple testified by phone (because he was closing on a house that day in California). Under oath, he shared the following facts:

---

[6] The protesters do not question the identity of the circulators, their status as U.S. citizens, their ages, their compliance with the affidavit requirements, or their status as registered Republicans in Colorado's statewide voter registration system before they collected the signatures in question. The protesters also do not challenge the validity of the signatures obtained by the circulators.

7

- In 2008, he and his wife and their daughter moved to Colorado, where his wife had grown up, and they "realized that's where [they] would like to stay." Tipple's in-laws live in Colorado Springs. While living in Colorado, Tipple and his wife had a boy they named "Breck," after the town of Breckenridge, Colorado.

- In 2008 and 2009, the economic slowdown caused Tipple's employer to reassign him to a project in Texas. His company subsequently moved him around the country for various projects, during which time Tipple made occasional trips to Colorado, at least once for work.

- Around 2016, Tipple was laid off.

- Since at least 2016, Tipple has lived in Ventura, California with his wife and four children. Most of Tipple's personal property is located in the Ventura home.

- Since 2016, Tipple has worked as a house flipper in California. He also drives for Lyft and Uber in California.

- In 2017, Tipple paid taxes as a resident in California. Tipple acknowledged that last year he spent the "overwhelming majority" of his time working in California.

- In January 2018, Tipple owned two cars registered in California and had a California driver's license with an expiration date in November 2018. He did not have a Colorado driver's license when he circulated the petition.

- He is registered to vote in California.

- He and his family spend the vast majority of their time in California. He "might have" spent 30 days in Colorado last year.

- Tipple came to Colorado on a round-trip ticket scheduled for January 15 to January 26, 2018, during which time he worked as a circulator for the Lamborn Campaign. While doing so, he stayed with his in-laws.

¶17    Tipple registered to vote in Colorado on May 9, 2016 (when he was in Colorado for an earlier stint as a circulator). For his Colorado voter registration, Tipple listed his in-laws' house in Colorado Springs as his primary residence.

¶18    Tipple testified he would like to move to Colorado, if he could secure long-term employment here. When discussing his job flipping houses, he said, "[I]deally I would

8

be able to do that back in Colorado . . . ." When asked whether he was mistaken in claiming Colorado residence, Tipple testified, "Well, I—I consider myself more a resident of Colorado in—in the long-term, uh, since having moved there in 2008." The Secretary asked whether Tipple considered himself a Colorado resident at the time he circulated the petition, to which Tipple responded: "Uh, as—as I mentioned earlier, uh—in—in a long-term sense, yes."

¶19 Ruling from the bench, the district court denied the relief requested by the protesters. The district court looked at whether "the circulators were in substantial compliance with the . . . election laws." The district court summarized its perception of the relevant law as, "What really governs under the—under the liberal reading of the election laws is the person's intent when they sign up to be a voter here in Colorado. Their intent to make Colorado their permanent home."

¶20 The district court concluded that five of the challenged circulators met Colorado's residency requirements, because they testified that when they registered to vote they intended to stay in Colorado, and they did not immediately leave the state after concluding their work for the Lamborn Campaign.

¶21 The district court found the other two circulators more problematic. The district court found by a preponderance of the evidence that one of the circulators, Jeffrey Carter, "wasn't, for the purposes of [the] statute, a registered voter" because, despite professing an intent to live in Colorado, at the relevant time he was actually looking for a job in Missouri while also traveling around the country working as a circulator. Having determined that Carter was not a resident of Colorado when he served as a

9

circulator, the district court struck the 58 signatures collected by Carter. This brought down the Lamborn Campaign's valid signature total down to 1211 signatures. No party challenges the district court's ruling as to Carter.

¶22 As for Tipple, the district court began by noting Tipple's family ties to Colorado. The district court then focused on Tipple's subjective intent to live in Colorado again in the future. It noted that "he had every intent of . . . becoming a resident of the state of Colorado. He just hadn't done so then." The court also observed that "at the time that he was circulating petitions, Mr. Tipple fits the definition of what would fit a registered voter. Someone who is attempting to move to the state of Colorado." The court concluded that Tipple was a resident and refused to strike the signatures collected by Tipple.

¶23 Because it found more than 1000 signatures to be valid, the district court denied the protesters' request to order the Secretary to refrain from certifying Representative Lamborn's name to the primary ballot.

¶24 On April 13, 2018, the protesters asked this court to review the district court's determination. The protesters argue the district court erred by using an incorrect test to determine the circulator's residency.

¶25 We accepted jurisdiction.[7]

---

[7] We exercised our jurisdiction to address the following reframed issues:

    4. [REFRAMED] What sources of information must the Colorado Secretary of State review to confirm a circulator's residency in evaluating the sufficiency of a major party candidate's petition to be on the ballot in a partisan election?

## II. Standard of Review

¶26 In reviewing the district court's order, we defer to a district court's findings of fact if they are supported by the record, Jones v. Samora, 2014 CO 4, ¶ 14, 318 P.3d 462, 467, and we review the district court's legal determinations de novo, Hanlen v. Gessler, 2014 CO 24, ¶ 33, 333 P.3d 41, 48.

## III. Analysis

¶27 We first consider what sources of information the Secretary must use to verify a major-party candidate petition in a partisan election. Sections 1-4-905(1) and 1-4-908(1) require the Secretary to compare the petition information against voter registration records to verify the petition. Section 1-4-905(3) also forbids the Secretary from accepting any section of a petition that does not have attached to it the notarized circulator affidavit required by section 1-4-905(2). Finally, section 1-4-908(1.5) requires the Secretary to compare each signature on a candidate petition with the signature of the eligible elector stored in the statewide voter registration system. Here, the Secretary properly relied on the information in the statewide voter registration system and the

---

5. [REFRAMED] If the Colorado Secretary of State properly certifies the sufficiency of a major party candidate's petition to be on the ballot in a partisan election, may the Petitioners nonetheless seek, through a proceeding under C.R.S. § 1-1-113, to challenge the residency status of a circulator?

6. [REFRAMED] If the Petitioners may challenge the residency status of a circulator through a proceeding under C.R.S. § 1-1-113 after the Colorado Secretary of State has properly certified the sufficiency of the petition, should the reviewing court consider the circulator's subjective intent regarding residency or instead rely merely on C.R.S. § 1-2-102 in assessing the residency of the circulator?

circulator affidavits in reviewing the sufficiency of the petition. The Secretary is neither obligated nor equipped to do more.

¶28 The question then becomes whether the review process must end there. In other words, does section 1-1-113 allow a protester to challenge the underlying validity of the information on which the Secretary legitimately relied? We answer that question in the affirmative. Section 1-4-908(3) provides that upon determining that the petition is sufficient, the designated election official "shall certify the candidate to the ballot"—but only "after the time for protest has passed." Section 1-4-909(1) expressly provides that after a candidate petition "has been verified and appears to be sufficient," a petition pursuant to section 1-1-113 "for a review of the validity of the [candidate] petition" may be filed with the district court within five days after the election official issues a statement of sufficiency. In the section 1-1-113 proceeding, a protester may present additional evidence as to a circulator's compliance with the strictures of section 1-4-905. In other words, the protesters here had a narrow opportunity to probe whether Tipple really was a Colorado resident when he acted as a circulator for the Lamborn Campaign.

¶29 Because the protesters timely challenged the validity of Tipple's residency, we turn to whether the district court erred by focusing almost exclusively on the circulator's subjective intent to move back to Colorado. We conclude that it did err, and that it should have instead considered whether Tipple already had a primary or principal place of abode in Colorado to which he presently intended to return, as confirmed by objective indicia of such residency. In examining the essentially

12

undisputed facts before us here, we conclude that Tipple was not a Colorado resident when he acted as a circulator for the Lamborn Campaign.

### D. The Secretary Properly Relied on Information in the Statewide Voter Registration System and Circulator Affidavits in Verifying the Candidate-Nomination Petition

¶30 Each candidate-nomination petition must include a signed, notarized, and dated affidavit executed by the person who circulated the petition. § 1-4-905(2). That affidavit must include, among other things, the circulator's address and a statement that the circulator was a resident of the state at the time he circulated the petition signed by the listed electors. Id. The designated election official shall not accept for filing any section of a petition that does not have attached to it the notarized affidavit required by this section. § 1-4-905(3).

¶31 After receiving a candidate-nomination petition, the Secretary must verify the petition information, including the circulator affidavit, against voter registration records. §§ 1-4-905(1), -908(1), -908(1.5).

¶32 Section 1-4-908(1) creates this responsibility as to all petition information: "Upon filing, the designated election official for the political subdivision shall review all petition information and verify the information against the registration records, and, where applicable, the county assessor's records." (Emphasis added.) For all petitions, the Secretary must also verify the collected signatures. § 1-4-908(1.5). The Secretary must compare the collected signatures against the signatures of eligible electors stored in the statewide voter registration system. Id.

13

¶33 Section 1-4-905(1) echoes this responsibility as to the voter registration and party affiliation of circulators:

> No person shall circulate a petition to nominate a candidate unless the person is a resident of the state, a citizen of the United States, at least eighteen years of age, and, for partisan candidates, registered to vote and affiliated with the political party mentioned in the petition at the time the petition is circulated, as shown in the statewide voter registration system.

(Emphases added.) The affidavit required by section 1-4-905(2) supplies the facial information verifying a circulator's residency. Section 1-4-905(2) requires the circulator to provide "a signed, notarized, and dated affidavit," containing, among other information, that the circulator "was a resident of the state" at the time the section of the petition was circulated. Under section 1-4-905(3), the election official shall not accept any petition section that does not have attached a notarized affidavit containing the information required by section 1-4-905(2).

¶34 After receiving a petition, the Secretary subjects it to a paper review. In conducting that paper review, the Secretary properly relies on the voter registration database information and the affidavit provided by the circulator. As a practical matter, the Secretary's office is not equipped to further investigate residency or other requirements.

¶35 Here, the protesters do not dispute that the Secretary followed the appropriate verification procedures to do a facial verification of Tipple's information. Instead, they look to the courts for vindication. So, we must address whether judicial review of the Secretary's decision is allowed under section 1-1-113.

14

## E. The Protesters May Challenge a Circulator's Residency in a Section 1-1-113 Proceeding

¶36 The protesters have sought to challenge Tipple's status as a Colorado resident (and thus, the validity of the Lamborn Campaign's petition) through a section 1-1-113 proceeding. Section 1-1-113(1) states, in relevant part, the following:

> When any controversy arises between any official charged with any duty or function under this code and any candidate, or any officers or representatives of a political party, or any persons who have made nominations or when any eligible elector files a verified petition in a district court of competent jurisdiction alleging that a person charged with a duty under this code has committed <u>or is about to commit a breach or neglect of duty or other wrongful act</u>, after notice to the official which includes an opportunity to be heard, upon a finding of good cause, the district court shall issue an order requiring substantial compliance with the provisions of this code.

(Emphasis added.) Here, the Secretary properly relied on the circulator affidavit and information in the voter registration database to conclude that the Lamborn Campaign's petition appeared sufficient. Thus, the question becomes whether the Secretary has another relevant duty he might be "about to" breach or neglect, or some other relevant wrongful act in which he might be "about to" engage. <u>Id.</u>

¶37 Section 1-4-908(3) states that upon determining that the petition is sufficient, the Secretary "shall certify the candidate to the ballot." Section 1-4-908(3) thus imposes a separate duty on the Secretary to place a candidate's name on the ballot. But that provision also makes clear that he may take that step only "<u>after the time for protest has passed</u>." <u>Id.</u> (emphasis added).

¶38 That protest procedure appears in section 1-4-909(1) ("Protest of designations and nominations"):

15

> A petition . . . that has been verified and <u>appears to be sufficient</u> under this code <u>shall be deemed valid unless a petition for review of the validity of the petition pursuant to section 1-1-113 is filed with the district court within five days</u> after the election official's statement of sufficiency is issued . . . .

(Emphases added.) Thus, the Election Code expressly contemplates that, within a narrow, five-day window after the election official issues a statement of sufficiency, a challenge to the "validity of the petition" may be brought through a proceeding under section 1-1-113, before the election official certifies a candidate to the ballot. Should the court determine that the petition is not in compliance with the Election Code, the election official would certainly "commit a breach or neglect of duty or other wrongful act," § 1-1-113(1), to nonetheless certify that candidate to the ballot under section 1-4-908(3).

¶39 The Secretary and the Lamborn Campaign argue that the district court's review under section 1-1-113 is limited to whether the Secretary technically complied with section 1-4-905(1) and section 1-4-908(1). Under their argument, the district court may not consider any extrinsic evidence regarding residency, because the Secretary's duty is fulfilled upon verifying the information provided by the circulators against voter registration records and the circulator affidavit. In contrast, the protesters argue that section 1-4-909(1) permits "review of the validity of the petition," and therefore, they may present evidence demonstrating that a petition actually fails to comply with the Election Code, even if it "appear[ed] to be sufficient" in a paper review. § 1-4-909(1).

16

¶40     We agree with the protesters.  Both the protest procedure outlined in section 1-4-911, C.R.S. (2017), and our precedent dictate that the district court can consider additional evidence when reviewing the validity of a candidate-nomination petition.

¶41     Section 1-4-911 states that the "party filing the protest has the burden of sustaining the protest by a preponderance of the evidence."  It also provides that the "decision upon matters of substance is open to review, if prompt application is made, as provided in section 1-1-113."  And as the protesters observe, this court has long rejected a narrow definition of the phrase "matters of substance."  In Leighton v. Bates, electors brought a challenge to the validity of a party nominee under a predecessor statutory scheme similar to that at issue here.  50 P. 856, 856–57 (Colo. 1897).  In Leighton, the district court held, much as the Secretary now argues, that the district court's jurisdiction was "strictly limited to a review of the case as made before the county clerk, and upon a certified copy of the proceedings before him; and that the court could not take any additional evidence, or try the case de novo."  Id. at 857.  We reversed the district court.  We held that "matters of substance" required the district court to hear evidence and review the election official determinations de novo.  Id. at 857–58.

¶42     In other election contexts, we have similarly clarified that judicial review includes the taking of evidence.  For example, in analogous municipal election cases we have held that judicial review can include the taking of evidence.  See, e.g., Gordon v. Blackburn, 618 P.2d 668, 670 (Colo. 1980) (holding in a proceeding under section 31-10-1305, C.R.S. (1977), that two electors who cast contested votes in a mayoral

17

election were not residents of the municipality after considering evidence related to their residency).

¶43    The Secretary attempts to distinguish the cases in which courts have probed into an individual's residency status by arguing that those cases involved circumstances in which a candidate's nomination petition had not been initially verified by the Secretary; whereas here the Lamborn Campaign's petition had been verified, and the protesters are seeking to invalidate his verified petition.   The Secretary argues that "any asymmetry between the situation that we have here, in which the Secretary has complied with § 1-4-905(1) and  § 1-4-908(1), and cases in which a petition is initially deemed insufficient or whose sufficiency is allegedly the product of fraudulently procured signatures, is a consequence of the liberal construction of the election code that § 1-1-103 requires."

¶44    But these attempts to distinguish our precedent are unpersuasive. Section 1-1-103, C.R.S. (2017), does require the Election Code to be liberally construed, but this requirement is independent from the issue of whether a protester may challenge the validity of a petition under section 1-4-909 by presenting evidence regarding an individual's residency status or other extrinsic evidence in a section 1-1-113 proceeding.  Indeed, the asymmetry that the Secretary urges would permit every facially valid petition to proceed, regardless of any underlying flaws.  Such an outcome could allow egregious misconduct by circulators to stand without recourse, so long as the paper review matched the statewide voter registration system.  For instance, section 1-4-905(2) also requires the circulator to include a "statement that the [circulator] has

18

not paid or will not in the future pay . . . any money or other thing of value to any signer for the purpose of inducing or causing the signer to sign the petition." Under the Secretary's interpretation, so long as the signatures of both the circulator and the citizen-signer matched information in the statewide voter registration system, a protester would be unable to present extrinsic evidence in a section 1-1-113 proceeding that the circulator had paid the citizen-signer to sign the petition. We cannot agree that the General Assembly intended such a result. See Burton v. Colorado Access, 2018 CO 11, ¶ 23, ___ P.3d ___ ("We avoid interpreting a statute in a way that creates absurd results if alternative interpretations consistent with the legislative purpose are available." (quotation omitted)).

¶45     Reading sections 1-4-905 and 1-4-908 together, it is clear that the Secretary's duties proceed in the following sequential fashion: (1) upon receipt of a candidate petition, the Secretary conducts the "paper review" of the petition by relying on information in the circulator affidavit and the statewide voter registration system; (2) if the Secretary determines the petition is sufficient, the Secretary issues a statement of sufficiency; and (3) after determining that the petition is sufficient, the Secretary certifies the candidate to the ballot—but only after the time for protest has passed. Any fact-intensive inquiry into a circulator's residency status must occur in this five-day protest window in which a party, like the protesters here, may seek review of the validity of the petition under sections 1-4-909 and 1-1-113. This fact-intensive inquiry must permit protesters to bring in extrinsic evidence if that evidence calls into question

the validity of the paper record on which the Secretary's initial approval appropriately rested.

¶46　Here, the protesters presented additional evidence concerning the circulators' residency. We must now determine whether the district applied the correct legal standard to determine whether Tipple was, in fact, a resident of Colorado, as required by section 1-4-905(1), when he served as a Lamborn Campaign circulator.

## F. Tipple Was Not a Resident of Colorado When He Circulated the Lamborn Campaign's Petition

¶47　So, what role, if any, does a circulator's subjective intent play in determining his residency? During its oral ruling, the district court summarized its perception of the relevant law as, "What really governs under the—under the liberal reading of the election laws is the person's intent when they sign up to be a voter here in Colorado. Their intent to make Colorado their permanent home." Relying almost exclusively on Tipple's testimony that he intended to live in Colorado in the future, the district court found that Tipple was a resident of Colorado at the time he served as a circulator.

¶48　The legal standard articulated and applied by the district court is reminiscent of the domicile test outlined in Theobald v. Byrns, 579 P.2d 609, 612 (Colo. 1978) ("We elect, therefore, to reject the principal-or-primary-home test, and hold that, if any of the applicants has a bona fide residence in Blue River and if he or she has the intention that Blue River is his or her domicile, which is evidenced by objective factors such as voter registration there, then that applicant's domicile is in Blue River and he or she is entitled to be a candidate on the ballot."). However, as we described more recently in Gordon,

the legislature superseded the subjective test adopted in <u>Theobald</u> with a "new method for determining the legal residence of an elector." <u>Gordon</u>, 618 P.2d at 671. The legislature's current method for determining residency of electors is now set forth in section 1-2-102, C.R.S. (2017), titled "Rules for determining residency."

¶49    Section 1-2-102 establishes rules to determine an elector's residency for Colorado voter registration. We conclude the factors listed in section 1-2-102(1)(b), C.R.S. (2017), also control in determining a circulator's residency under section 1-4-905(1). We note that a person's residency is raised twice in section 1-4-905(1). First directly, because all circulators must be residents of the state; and second indirectly, because circulators for partisan candidates must be registered to vote (which implicates section 1-2-102's requirement that the person be a resident of the state). It seems reasonable to infer that the General Assembly did not seek to impose two different residency requirements through these direct and indirect references to residency in section 1-4-905(1). Thus, we conclude that the factors listed in section 1-2-102 are controlling for both references to residency in section 1-4-905(1). <u>See</u> <u>R.E.N. v. City of Colo. Springs</u>, 823 P.2d 1359, 1364 n.5 (Colo. 1992) ("<u>In pari materia</u> is a rule of statutory construction which requires the various portions of the statute to be read together with all the other statutes relating to the same subject or having the same general purpose so that the legislature's intent may be ascertained." (citation omitted)); <u>People v. White</u>, 242 P.3d 1121, 1125 (Colo. 2010) (relying on the principal-or-primary-home test in determining jury residency and noting that the test is "now expressly made applicable to motor vehicle and income tax matters as well").

21

¶50 Section 1-2-102(1)(a)(I), C.R.S. (2017), defines residency as a person's "principal or primary home or place of abode." The statute lists the following factors the court must consider to determine a person's "principal or primary place of abode":

> Business pursuits, employment, income sources, residence for income or other tax purposes, age, marital status, residence of parents, spouse or civil union partner, and children, if any, leaseholds, situs of personal and real property, existence of any other residences and the amount of time spent at each residence, and motor vehicle registration.

§ 1-2-102(1)(b). The statute states that intent can be relevant when determining that the person, when absent, has the "present intention of returning" to that home or place of abode. See § 1-2-102(1)(a)(I) ("A principal or primary home or place of abode is that home or place in which a person's habitation is fixed and to which that person, whenever absent, has the present intention of returning after a departure or absence, regardless of the duration of the absence."). Yet, as the Gordon court noted, the principal-or-primary-home test rejects a scenario in which a person can subjectively declare a second address to be his true home, without considering whether there is objective evidence supporting that declaration. Gordon, 618 P.2d at 670–71.

¶51 Thus, the district court erred as a matter of law by relying exclusively on Tipple's stated subjective intent, without considering the objective indicia of his principal or primary place of abode under section 1-2-102(1)(b), to determine Tipple's residency.

¶52 Because each of the objective factors delineated in section 1-2-102(1)(b) indicates that Colorado was not Tipple's "primary or principal place of abode," as a matter of law, Tipple was not a resident of Colorado during the time Tipple served as a circulator

22

in January 2018. When we apply the section 1-2-102(1)(b) factors to the evidence regarding Tipple's primary place of abode, this becomes plain:

- Tipple's business pursuits, employment, and income sources (as a house flipper and Lyft and Uber driver) are in California;

- Tipple filed taxes in California last year;

- Tipple's wife and four children have lived in California since at least 2016;

- Although Tipple's in-laws are in Colorado, no evidence was presented regarding where his parents reside;

- Tipple does not appear to hold any leasehold interests in Colorado;

- Tipple owns a house in California, and the majority of his personal property is in California;

- Tipple and his family spend the vast majority of their time in California; he "might have" spent 30 days in Colorado last year; and

- Tipple's two vehicles are registered in California.

See § 1-2-102(1)(b).

¶53    Furthermore, with respect to Tipple's attempt to establish residency in Colorado for voter registration purposes, Tipple's stated intent to live in Colorado in the future is relevant only if he has a fixed habitation in Colorado to which he presently intends to return. See § 1-2-102(1)(a)(I). The record reveals none. While he occasionally stays at his in-laws' home in Colorado Springs—which is the address he used to register to vote and on his affidavit—he has no legal interest in the property, nor is there any evidence to suggest that at the time he submitted his voter registration and circulated the Lamborn Campaign's petition it was his fixed habitation. On the contrary, all of the objective record evidence regarding his residence at the time he circulated the petition

23

for the Lamborn Campaign indicates that his primary place of abode was in California. Consequently, we conclude that Tipple was not a Colorado resident when he served as a circulator for the Lamborn Campaign.

¶54    Because Tipple did not meet the statutory requirements to be a circulator, the signatures Tipple collected must be stricken from the Lamborn Campaign's candidate-nomination petition. See Loonan v. Woodley, 882 P.2d 1380, 1382 (Colo. 1994) (upholding order vacating the Secretary's determination of sufficiency and enjoining the Secretary from certifying proposed initiative to the ballot due to circulator's failure to comply with statutory requirements).[8]

## IV.  Constitutional Challenge

¶55    Finally, to the extent the Lamborn Campaign challenges the constitutionality of the circulator residency requirement in section 1-4-905(1), this court lacks jurisdiction to address such arguments in a section 1-1-113 proceeding.  See Frazier v. Williams, 2017 CO 85, ¶ 3, 401 P.3d 541, 542 (holding this court has jurisdiction to consider only claims

---

[8] The district court found that Tipple substantially complied with the Election Code.  See § 1-1-103(3) ("Substantial compliance with the provisions or intent of [the Election Code] shall be all that is required . . . ."); Fabec v. Beck, 922 P.2d 330, 341 (Colo. 1996) (holding a court should consider the following factors in determining whether a party has substantially complied with statutory requirements: "(1) the extent of noncompliance, (2) the purpose of the applicable provision and whether that purpose is substantially achieved despite the noncompliance, and (3) whether there was a good-faith effort to comply or whether noncompliance is based on a conscious decision to mislead the electorate").  However, residency is not a mere technical requirement that is subject to substantial compliance.  See, e.g., Order, Frazier v. Williams, 16SA159 (Colo. May 24, 2016) ("As to the 45 signatures collected by James Day, we conclude that the omission of an apartment number meets the standard of substantial compliance." (emphasis added)).  A person either is a resident for purposes of the Election Code or he is not.

24

of "breach or neglect of duty or other wrongful act" <u>under the Colorado Election Code</u> when a petition is brought through a section 1-1-113 proceeding). Therefore, we express no opinion on this issue.

## V. Conclusion

¶56 In sum, although the Secretary properly relied on the circulator's affidavit and information in the voter registration system in verifying the petition and issuing a statement of sufficiency, the protesters nonetheless had the statutory right to challenge the validity of the petition under sections 1-4-909 and 1-1-113 before the Secretary certified Representative Lamborn's name to the ballot. The protesters properly presented additional evidence to the district court in challenging the actual residence of the petition circulators.

¶57 We conclude the district erred when it focused on Tipple's subjective intent to move back to Colorado, rather than the test set forth in section 1-2-102, when determining Tipple's residency. In applying the correct test to the essentially undisputed facts here, we conclude that Tipple was not a resident of Colorado when he served as a circulator for the Lamborn Campaign. Accordingly, we reverse the district court's ruling to the contrary. Because Tipple was statutorily ineligible to serve as a circulator, the signatures he collected are invalid and may not be considered. That causes the Lamborn Campaign's number of signatures to fall short of the 1000 required to be on the Republican primary ballot. Therefore, the Secretary may not certify Representative Lamborn to the 2018 primary ballot for CD5. We recognize the gravity of this conclusion, but Colorado law does not permit us to conclude otherwise.

¶58 Finally, we do not address the Lamborn Campaign's arguments regarding the constitutionality of the circulator residency requirement in section 1-4-905(1), because we lack jurisdiction to address such claims in a proceeding under section 1-1-113.